[Cite as *Conley v. Endres Processing Ohio, L.L.C.*, 2013-Ohio-419.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**WYANDOT COUNTY**


MICHAEL J. CONLEY, ET AL.,

    PLAINTIFFS-APPELLANTS,            CASE NO. 16-12-11

    v.

ENDRES PROCESSING OHIO, LLC,

                            **O P I N I O N**

    DEFENDANT-APPELLEE.


Appeal from Wyandot County Common Pleas Court
Trial Court No. 11-CV-0064

**Judgment Affirmed**

Date of Decision: February 11, 2013


APPEARANCES:

    *Nicholas M. Dodosh* for Appellants

    *Erin N. Poplar* for Appellee

Case No. 16-12-11

**PRESTON, P.J.**

{¶1} Plaintiff-appellant, Michael J. Conley,[1] appeals the Wyandot County Court of Common Pleas' judgment granting defendant-appellee, Endres Processing Ohio, LLC, summary judgment. Conley argues that the trial court erred when it granted Endres Processing's motion for summary judgment because the record creates a genuine issue of material fact in dispute. For the reasons that follow, we affirm.

{¶2} Conley worked for Endres Processing as a material handler from July 2008 through July 2009. (Conley Depo. at 8, 13). In July 2009, Conley went to check an auger that Nate Johnson, the control room operator at that time, believed was not working properly. (*Id.* at 44-45). Conley discovered the auger was not turning and used a radio to tell Johnson to turn it off because it was burning the belts. (*Id.* at 45-46). At that time, a metal plate that covered the belts and pulleys was not on the auger, but was on the catwalk where the auger was located. (*Id.* at 47). Conley did not have a lockout device and did not lockout/tagout the machine. (*Id.* at 27, 98). A power disconnect switch was also located near the auger, but Conley did not use it. (*Id.* at 107). Instead, Conley told Johnson to turn the auger back on, and then turn it off so Conley could observe the belts and pulleys to determine the problem. (*Id.* at 46-47). Conley believed that Johnson would then

---

[1] Conley's minor children, whose loss of consortium claim the trial court dismissed on summary judgment, are also plaintiffs-appellants .

leave the auger turned off. (*Id.*) Conley put his hand in the auger to check the tension of one of the belts. (*Id.*) At the same time, Johnson turned the auger back on. (*Id.*). Conley's fingers were caught in the belts and pulleys, resulting in a cut to his middle finger and nail, as well as the amputation of his index finger. (*Id.* at 48-52).

{¶3} On May 9, 2011, Conley filed a complaint against Endres Processing alleging an intentional employer tort and seeking in excess of $25,000 in damages. (Doc. No. 1). Endres Processing filed its answer on August 1, 2011. (Doc. No. 13).

{¶4} On April 19, 2012, Endres Processing filed a motion for summary judgment. (Doc. No. 23). On May 21, 2012, Conley filed his motion in opposition. (Doc. No. 33). On June 22, 2012, Endres Processing filed a motion in response. (Doc. No. 53). On July 20, 2012, Conley filed a sur-reply to Endres Processing's motion. (Doc. No. 65). On August 2, 2012, the trial court filed its judgment entry granting Endres Processing's motion for summary judgment. (Doc. No. 76).

{¶5} On August 27, 2012, Conley filed a notice of appeal. (Doc. No. 80). Conley now raises one assignment of error and Endres Processing raises one cross-assignment of error for our review.

**Assignment of Error No. I**

**The trial court erred to the prejudice of plaintiff-appellant Michael Conley when it granted the motion for summary judgment of defendant-appellee Endres Processing Ohio, LLC because the evidence as set forth in the record creates a genuine issue of material fact in dispute.**

{¶6} In his sole assignment of error, Conley argues the trial court erred by granting Endres Processing's motion for summary judgment because the record creates a genuine issue of material fact regarding whether Endres Processing committed an employer intentional tort. Conley contends that Endres Processing deliberately removed a safety guard attached to the auger, creating a rebuttable presumption that Endres Processing intended to injure him. Conley also argues that Endres Processing failed to comply with appropriate lockout/tagout procedures and removed a safety guard when it failed to provide him with a lockout device.

{¶7} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

{¶8} Material facts are those facts "that might affect the outcome of the suit under the governing law." *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Whether a genuine issue exists is answered by the following inquiry: [d]oes the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" *Turner* at 340, citing *Liberty Lobby, Inc.*, at 251-252.

{¶9} Summary judgment should be granted with caution, resolving all doubts in favor of the nonmoving party. *Osborne v. Lyles*, 63 Ohio St.3d 326, 333 (1992). "The purpose of summary judgment is not to try issues of fact, but is rather to determine whether triable issues of fact exist." *Lakota Loc. School Dist. Bd. of Edn. v. Brickner*, 108 Ohio App.3d 637, 643 (6th Dist.1996).

{¶10} R.C. 2745.01, which pertains to employer intentional torts, states in pertinent part:

(A)   In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with

the intent to injure another or with the belief that the injury was substantially certain to occur.

(B)   As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

(C)   Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or occupational disease or condition occurs as a direct result.

* * *

{¶11} The Supreme Court of Ohio recently addressed the issue of what constitutes "deliberate removal" of an "equipment safety guard" pursuant to R.C. 2745.01(C) in *Hewitt v. L.E. Myers Co.*, 2012-Ohio-5317.   In that case, Larry Hewitt was working as an apprentice lineman for L.E. Myers Company, an electrical-utility construction contractor.  *Id*. at ¶ 4.  Hewitt's task was to work in an elevated bucket to tie in a new power line, which was de-energized.  *Id*. at ¶ 6. According to L.E. Myers' policy and the job briefing log, workers were required to wear rubber gloves and sleeves on that day.  *Id*.  Hewitt claimed that another lineman told him that he did not need to wear the gloves and sleeves because the

line was de-energized. *Id*. Hewitt admitted that the gloves and sleeves were available. *Id*. At some point, another lineman yelled at Hewitt from the ground while Hewitt was working in the elevated bucket. *Id*. at ¶ 7. Hewitt turned towards the lineman, and the wire he was holding came into contact with an energized line, resulting in severe burns. *Id*. Hewitt filed an action against L.E. Myers, alleging a workplace intentional tort. *Id*. at ¶ 9.

{¶12} The Court held that "as used in R.C. 2745.01(C), 'equipment safety guard' means a device designed to shield the operator from exposure to or injury by a dangerous aspect of the equipment, and the 'deliberate removal' of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard." *Id*. at ¶ 2. The Court determined that the gloves and sleeves were personal items that the employee controls, and thus are not "an equipment safety guard" pursuant to R.C. 2745.01(C). *Id*. at ¶ 3. The Court further stated, "[a]n employee's failure to use them, or an employer's failure to require an employee to use them, does not constitute the deliberate removal by an employer of an equipment safety guard." *Id*. The Court rejected a broader interpretation of "equipment safety guard," stating, "to include any generic safety-related item ignores not only the meaning of the words used but also the General Assembly's intent to restrict liability for intentional torts." *Id*. at ¶ 24. The Court also held that "deliberate removal"

pursuant to R.C. 2745.01(C) "may be described as a careful and thorough decision to get rid of or eliminate an equipment safety guard." *Id*. at ¶ 29.

{¶13} In the present case, Conley argues that Endres Processing removed an equipment safety guard within the meaning of R.C. 2745.01(C) by failing to provide him with a lockout device and by removing the metal plate that covered the auger's belts and pulleys. This Court has previously rejected the argument that an employer's failure to comply with proper lockout/tagout procedures implicates R.C. 2745.01(C) in *Klaus v. United Equity, Inc.*, 3d Dist. No. 1-07-63, 2010-Ohio-3549, ¶ 33. Additionally, in *Hewitt*, the Supreme Court of Ohio differentiated between "personal protective items that the employee controls" and "a device that is designed to shield the operator from exposure to or injury by a dangerous aspect of the equipment." *Hewitt* at ¶ 26.

{¶14} Here, the lockout device is an item that the employee controls rather than an "equipment safety guard" pursuant to R.C. 2745.01(C). Similar to the sleeves and gloves in *Hewitt*, locks were available in the control room. (Aten Depo. at 34-36); (Teynor Depo. at 78); (Huffman Depo. at 38-39); (Holdman Depo. at 47). Conley admitted that he had observed the locks in the control room but did not ask anyone if he could use them. (Conley Depo. at 27). Conley believed that the locks belonged to other employees. (*Id*. at 29). Viewing the evidence in the light most favorable to Conley and assuming he could not use one

of the control room locks to lockout/tagout the machine, the auger where Conley was injured had a power disconnect switch located next to it that could be used without a lockout/tagout device. (Aten Depo. at 37). Other employees used the power disconnect switch when they did not lockout/tagout the machine. (*Id*. at 38); (Huffman Depo. at 51). Conley admitted that he knew how the power disconnect switch operated and that it did not require any special equipment. (Conley Depo. at 106-107). Conley also acknowledged that when he had assisted other employees when they changed the belts, they had locked out the machine. (*Id*. at 74). Conley testified that he did not request that Johnson lockout/tagout the machine, that there was no particular reason that he did not request that someone else lockout/tagout the machine, and that he did not think to use the power disconnect switch. (*Id*. at 84, 98, 107). Furthermore, Endres Processing provided, and Conley attended, a lockout/tagout training on the day of the incident. (*Id*. at 94-95). After reviewing the evidence, we conclude that the lockout/tagout device was a personal protective item within Conley's control rather than a "safety guard" pursuant to R.C. 2745.01(C). Similar to the sleeves and gloves in *Hewitt*, Conley could have avoided the danger by accessing available safety equipment. Conley acknowledges that lockout devices were located in the control room, other employees had lockout devices, and the power disconnect switch would have served the same purpose. Consequently, Conley's failure to use the lockout/tagout

device, and any failure by Endres Processing to require him to use a lockout/tagout device, cannot constitute a deliberate removal of a safety guard within the meaning of R.C. 2745.01(C). *See Hewitt* at ¶ 3.

{¶15} We will next address Conley's argument that Endres Processing deliberately removed a metal plate that covered the auger's belts and pulleys, which Conley contends is a safety guard pursuant to R.C. 2745.01(C). Assuming *arguendo* that the metal plate is a safety guard, we cannot find any evidence that Endres Processing deliberately removed it. The deposition testimony establishes that while the metal plate was frequently removed from the auger, it could have been removed by any number of employees, the failure to replace it was likely inadvertent, and Endres Processing had not directed the employees to remove the metal plate and not replace it.

{¶16} Michael Aten, an Endres Processing material handler, testified that the metal plate was sometimes off the machine, even when no one was working on it. (Aten Depo. at 42). Aten believed the plate was off the machine a fairly high percentage of the time, at least half the time he was near the auger. (*Id*. at 42-43). Aten testified that an employee could take the cover off and put it back on with a crescent wrench. (*Id*. at 45). Aten also testified that a material handler, maintenance person, or supervisor could have removed the guard because crescent wrenches were available to all the employees. (*Id*. at 73-74).

{¶17} Jesse Teynor, a control room operator, testified that he would occasionally forget to replace the metal plate after he had finished working on the machine. (Teynor Depo. as 28-29). Teynor estimated that he forgot to replace the plate about 20 percent of the time. (*Id*. at 30). Teynor testified that any operator or maintenance person could remove the metal plate, but that he did not know who removed it prior to Conley's injury. (*Id*. at 39).

{¶18} Conley testified that at the time of his injury, the metal plate was not on the auger, but that it was on the catwalk. (Conley Depo. at 46-47). Conley estimated that the metal plate was on the machine about half of the time, and off the machine about half the time. (*Id*. at 76). Conley also testified that the plate had to be removed to expose the belts, and "[t]o make sure that the motor is moving and everything else is moving." (*Id*. at 79-80). Conley believed that maintenance personnel were most likely to have removed the metal plate. (*Id*. at 80). Conley stated that he had never removed the plate. (*Id*.). Conley testified that it would only take a few minutes to take the plate off or put it back on the machine. (*Id*. at 87). Conley also testified that his supervisors had not instructed him to take the metal plate off of the machine and to leave it off. (*Id*. at 88).

{¶19} According to Patrick Huffman, a control room operator, employees frequently took the metal plate off the machine and put it back on, and many times the auger ran without the plate. (Huffman Depo. at 49-50). Huffman testified that

he had not observed anyone take the metal plate off and fail to replace it. (*Id*. at 50). Huffman also testified that he had never instructed anyone to remove the metal plate and not replace it. (*Id*. at 54). Huffman testified that for the work Conley was doing, he would have had to remove the plate. (*Id*. at 63). Huffman estimated that the metal plate was in place 90 or 95 percent of the time. (*Id*. at 64).

**{¶20}** After reviewing the evidence, we cannot find any indication that Endres Processing made a "deliberate decision to lift, push aside, take off, or otherwise eliminate" the metal plate. *Hewitt*, 2012-Ohio-5317, at ¶ 2. We also cannot find any evidence that Endres Processing made "a careful and thorough decision to get rid of or eliminate" the metal plate. *Id*. at ¶ 29. At most, the evidence demonstrates that Endres Processing may have been aware that at times employees failed to replace the metal plate after removing it. However, there is no evidence that this failure was the result of a deliberate decision by Endres Processing. Rather, it appears that the employees' failure to replace the plate was usually inadvertent, and not a consequence of any instruction by Endres Processing. Furthermore, Conley has not presented any evidence regarding who removed the metal plate on the day of his accident. Conley himself admitted that any number of employees could have removed the metal plate. Thus, we cannot

find that the fact that the metal plate was removed from the auger on the day of Conley's accident was the result of a deliberate decision by Endres Processing.

{¶21} Conley's assignment of error is, therefore, overruled.

### Cross-Assignment of Error No. I

**The trial court erred in determining that the belt cover was a "safety guard" as that term is intended under R.C. §2745.01(C).**

{¶22} In its cross-assignment of error, Endres Processing argues the trial court erred in determining that the metal plate covering the auger's belts and pulleys is a safety guard pursuant to R.C. 2745.01(C). Endres Processing contends that a "safety guard" for purposes of the statute is a device which prevents an operator from accidentally placing his hands in a machine during its normal operation. Endres Processing argues the auger at issue in this case is operated from the control room, so it does not have the type of "safety guard" intended by the statute. Endres Processing compares the auger's metal plate to the hood of a car, contending that removing the metal plate to work on the belts and pulleys is analogous to removing a car's hood to work on the engine. Endres Processing argues that this interpretation of "safety guard" is not what the legislature intended.

{¶23} Based upon our disposition of Conley's assignment or error, resulting in an affirmance of the trial court's decision, this defensive assignment of error is moot and need not be considered. *See Trudell v. Trudell*, 3d Dist. No. 5-

11-47, 2012-Ohio-5023, ¶ 24; *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2005-Ohio-6553, ¶ 31-32; *Parton v. Weilnau*, 169 Ohio St. 145 (1959), paragraph seven of the syllabus (We may consider an appellee's cross-assignment of error "only when necessary to prevent a reversal of the judgment under review.").

**{¶24}** Having found no error prejudicial to the appellants herein in the particulars assigned and argued and having found appellee's cross-assignment of error moot, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**