RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NORMAN RUDISILL and KAREN RUDISILL,
　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

FORD MOTOR COMPANY,
　　　　　　　*Defendant-Appellee*.

No. 12-3486

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:08-cv-02409—Sara E. Lioi, District Judge.

Argued: January 23, 2013

Decided and Filed: March 11, 2013

Before: CLAY, GILMAN, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

_____

**ARGUED:** Christopher Holecek, WEGMAN, HESSLER & VANDERBURG, Cleveland, Ohio, for Appellants. Paul D. Hudson, MILLER CANFIELD PADDOCK AND STONE, PLC, Kalamazoo, Michigan, for Appellee. **ON BRIEF:** Christopher Holecek, Angela M. Lavin, WEGMAN, HESSLER & VANDERBURG, Cleveland, Ohio, for Appellants. Kip T. Bollin, Elizabeth B. Wright, Barbara A. Lum, THOMPSON HINE LLP, Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

RONALD LEE GILMAN, Circuit Judge. After receiving workers' compensation benefits for serious injuries sustained while working at Ford Motor Company's Cleveland Casting Plant (the Plant) in Brook Park, Ohio, Norman Rudisill sued Ford for committing an intentional tort against him. His wife, Karen Rudisill, asserted a derivative claim of loss of consortium in the same complaint. The district

1

court granted summary judgment for Ford, holding that Rudisill had not presented sufficient evidence to create a genuine dispute of material fact as to whether Ford deliberately intended to injure him.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  The incident

The facts surrounding Rudisill's employment at Ford and the incident that gave rise to this action are not in dispute.  Rudisill began working for Ford in 1994 as a general laborer.  He rose through the ranks to become a Team Leader by the time of the events at issue in this case.  The position of Team Leader is, according to Rudisill, "one step below management."  As a Team Leader, Rudisill was responsible for ensuring the continued operation of Mold Line 2 at the Plant.

Mold Line 2 is one of three mold lines where engine blocks are cast in molten metal.  The mold-line process is described in detail by the district court as follows:

> The mold line process employs a system of hooks, pulleys and rails suspended over an open pit.  Along the rail system runs a chain of flat iron carts called "cartops."  On top of each cartop sits a heavy iron crate-like fixture called a "drag flask."
>
> The cartops and drag flasks cycle around the mold line together.  At the beginning of the mold line, the drag flask is filled with compacted sand that is pressed in the shape of an engine block.  This forms the bottom half of the mold for the engine block.  An "engine core," which contains the internal components of the engine block, is placed onto the molded sand and is covered by a "cope flask."  The cope flask is the top half of the mold for the engine block.  Through an automated process, molten iron is poured into the mold (i.e. between the drag flask and cope flask).  The molten iron surrounds the engine core and hardens into the engine block.  Once the engine block is formed, it is removed at a section of the mold line called the "hooking station."  A chain hooked to an overhead conveyor system is attached to the engine block and lifts it off the drag flask, carrying the engine block away from the mold line.  The drag flask remains on the cartop and circles back to the beginning of the mold line to be used to make another engine block.

Occasionally, iron runs out of the drag flask on to the cartop. This over-pour of molten steel is referred to as a "hot-head." At one of the final stops along the mold line, an employee known as the "rake-off man" uses a long metal pole to remove hot-heads and sand from the top of the drag flask, scraping them into a conveyor system running in the subfloor five feet below the mold line. The conveyor system collects the semi-molten hot-heads and hot sand into a "shaker pan." The shaker pan system carries these materials to another part of the plant for disposal. This final process of separating the engine block from the drag flask, raking hot sand and semi-molten hot-heads off the drag flask into the shaker pan system, preparing the drag flask for another round of molding, occurs at the "pick-off station." The pick-off station is where the rake-off man works. This is the location where Mr. Rudisill's accident occurred.

Sometimes, during the process of pouring the molten metal into the mold, some molten metal spills out (a "run-out") and cools onto the rim of the drag flask before it reaches the rake-off station. These run-outs must be removed from the drag flask before it can be used again for another engine mold. To make this repair, the mold line is shut down and the drag flask is pulled off the line by an overhead crane and hoist. Mr. Rudisill testified that this is a routine process which he [had] performed hundreds of times.

In order to remove the drag flask from the mold line, employees first have to remove two sections of removable wall ("guard rails") from the outer edge of the mold line. This exposes the pit containing the sub-floor conveyor system and shaker pan with semi-molten materials being carried away for disposal. At the time of Mr. Rudisill's accident, the guard rails constituted the only barrier between the employees at the pick-off station and the open pit beneath the mold line. This pit measures 28 inches by 68 inches with a depth of 59 inches.

Once the guard rails are removed, a hoist is attached to the drag flask to lift it off the cartop. To do this, employees stand near the edge of the pit and secure the hoist clamps to the drag flask. The clamp that is attached to the far side of the drag flask has to be slung over the drag flask and then pulled taut to catch on the lip of the drag flask. Once the hoist is attached, the drag flask is moved to the Plant floor where it is picked up by a forklift and taken to a different area for repair. The guard rails are then replaced and production resumes.

On February 2, 2007, Rudisill was informed that a drag flask had to be taken off the mold line for run-out removal. He was assisted in accomplishing this task by Willie Daniel, a drag-flask repairman, and Scott O'Neill, another employee. After they moved

the drag flask over the pit and had it suspended above the floor, Rudisill began hitting the flask with a sledgehammer to dislodge the cooled run-out. As Rudisill hit the drag flask, sand started slipping out. The flask then tipped due to the imbalance, which caused one of the clamps to slip off and hit Rudisill in the face. Rudisill was knocked back against a wall, fell to the floor, and rolled forward through the floor opening into the hot pit below. He lay there unconscious, being burned by the hot-heads in the shaker pan.

Seeing the trouble that Rudisill was in, coworker Ernest McClanahan jumped down to the rescue. McClanahan, assisted by Ford emergency personnel, eventually managed to get Rudisill out of the pit. Rudisill had gained consciousness by this time and was screaming in pain.

As a result of the incident, Rudisill sustained a head injury that required several staples to close. He was also burned on both arms, both legs, the abdomen, and the left hand. Rudisill continues to experience pain, dizzy spells, ringing in the ears, and memory problems. He has had numerous surgeries to treat his injuries, and has undergone physical and occupational therapy.

After conducting a safety review immediately following the incident, Ford decided to modify the flask-removal process. Now, when preparing for flask removal, Ford employees slide metal grates over the pit before removing the guard rails. These grates are added to ensure that any person who might otherwise fall through the floor opening would instead fall onto the grates.

## B. This action

Rudisill and his wife filed a complaint against Ford in Ohio state court in September 2008. The complaint alleges an intentional tort under both Ohio Revised Code § 2745.01 and common law on behalf of Rudisill, as well as a derivative claim of loss of consortium on behalf of his wife. Ford removed the case to the United States District Court for the Northern District of Ohio. The case was subsequently stayed pending the Ohio Supreme Court's determination of whether § 2745.01 is in conflict

with the Ohio Constitution, and was reopened when that court upheld the statute. Ford then filed a motion for summary judgment, which Rudisill opposed. In March 2012, the district court granted Ford's motion for summary judgment.

The district court began its analysis by examining the structure of Ohio Revised Code § 2745.01. Under the statute, an employee may recover for workplace torts only upon a showing that the employer acted with the deliberate intent to injure. Ohio Rev. Code § 2745.01(A)-(B). Removing equipment safety guards creates a presumption of intent to injure, but the employer may rebut the presumption by showing that it did not in fact intend to injure the employee. *Id.* § 2745.01(C).

The district court's analysis proceeded in two steps. First, the court held that, assuming a presumption of intent to injure arose from the guard rails' removal, Ford had successfully rebutted that presumption by introducing evidence showing the lack of an intent to injure Rudisill. The court then held that, in the absence of the presumption, Rudisill had not submitted sufficient evidence to create a genuine dispute of material fact as to Ford's intent to injure. Finding no genuine dispute of material fact, the court granted summary judgment for Ford on the intentional-tort claim and dismissed the loss-of-consortium claim as derivative.

On appeal, Rudisill attacks both steps of the district court's analysis. He first contends that the question of whether Ford successfully rebutted the intent-to-injure presumption should have gone to the jury. Second, he argues that, even without the presumption, there was sufficient evidence to create a triable issue of fact as to whether Ford committed an intentional tort.

## II. ANALYSIS

### A. Standard of review

We review de novo a district court's decision to grant summary judgment. *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion for

summary judgment should not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## B. Statutory framework

As with every state in the country, Ohio has a workers' compensation system. This system represents a public-policy tradeoff: Employees receive guaranteed compensation for injuries arising out of their employment, regardless of fault, thereby obtaining a degree of protection against workplace injuries and bypassing the myriad defenses and exceptions that often permitted employers to escape liability at common law; in return, employees waive the right to bring tort actions against their employers for workplace injuries, thereby minimizing the expense and administrative burden of litigation and giving employers a measure of peace. *See, e.g.*, *Kaminski v. Metal & Wire Prods. Co.*, 927 N.E.2d 1066, 1071-72 (Ohio 2010) (describing the constitutional and legislative enactments comprising Ohio's workers' compensation system as "public policy trade-offs by which the employee achieved a certain and speedy recovery in exchange for granting a more limited liability to the employer") (internal quotation marks omitted); *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 927 N.E.2d 1092, 1104 (Ohio 2010) ("[W]orkers' compensation laws are the result of a unique compromise between employees and employers, in which employees give up their common-law remedy and accept possibly lower monetary recovery, but with greater assurance that they will receive reasonable compensation for their injury. Employers in turn give up common-law defenses but are protected from unlimited liability.").

A linchpin of this policy tradeoff is the exclusivity of the workers' compensation remedy. *Stetter*, 927 N.E.2d at 1108 ("One of the fundamental pillars supporting [the legislation] is the exclusivity of the no-fault compensation system."). "The two most important reasons for the exclusivity of the workers' compensation remedy are[,] first, to maintain the balance of sacrifices between employer and employee in the substitution

of no-fault liability for tort liability and, second, to minimize litigation, even litigation of undoubted merit." *Id.* at 1107 (internal quotation marks omitted). This balance of sacrifices is reflected in the Ohio Constitution, where the same provision that authorizes the creation of the workers' compensation fund also provides that

> [s]uch compensation shall be in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease, and any employer who pays the premium or compensation provided by law . . . shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease.

Ohio Const. art. II, § 35.

Despite this constitutional language, the Ohio Supreme Court has long held that the exclusivity of the workers' compensation remedy is subject to an exception in the case of intentional torts. *See, e.g.*, *Triff v. Nat'l Bronze & Aluminum Foundry Co.*, 20 N.E.2d 232, 232, 238-39 (Ohio 1939) (holding that Article II, § 35 of the Ohio Constitution did not take away the right of employees to sue in tort for injuries that would be "non-compensable" under the workers' compensation system); *Blankenship v. Cincinnati Milacron Chems., Inc.*, 433 N.E.2d 572, 573 (Ohio 1982) ("An employee is not precluded by Section 35, Article II of the Ohio Constitution . . . from enforcing his common law remedies against his employer for an intentional tort."); *see generally Kaminski*, 927 N.E.2d at 1071-78 (describing the history of the Ohio workers' compensation system and of legislative and judicial attempts to define the scope of the intentional-tort exception).

The intentional-tort exception in Ohio was originally forged by the common law. And it came to encompass two distinct kinds of intentional torts: (1) those where the tortfeasor acts with the deliberate intent to cause an injury, and (2) those where the tortfeasor believes that his acts are "substantially certain" to result in an injury even though he does not intend to cause the specific injury that actually occurred. *See Jones v. VIP Dev. Co.*, 472 N.E.2d 1046, 1047 (Ohio 1984) ("An intentional tort is an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur."); *Kaminski*, 927 N.E.2d at 1085 (summarizing

common-law jurisprudence, under which "'direct intent' torts are those in which the actor's action brings about the exact result desired, while 'inferred intent' torts are those in which the actor believes his action is 'substantially certain' to cause a particular result, even if the actor does not desire to bring that result about").

For nearly a century, the Ohio Supreme Court jealously guarded the boundaries of common-law intentional tort, repudiating as unconstitutional various attempts by the Ohio legislature to codify the intentional-tort exception into a statute that confined intentional torts to circumstances where the employer acted with the specific intent to injure. *See Kaminski*, 927 N.E.2d at 1071-79 (chronicling the Ohio legislature's successive workers' compensation legislation and the Ohio Supreme Court's subsequent repudiation of the same). But the court finally relented in a pair of decisions issued in 2010—*Kaminski*, 927 N.E.2d 1066, and *Stetter*, 927 N.E.2d 1092—which upheld as constitutional an Ohio statute that significantly limits the scope of the common-law exception.

That statute—which is the basis of Rudisill's complaint in the present case—reads in pertinent part as follows:

> (A) In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.
>
> (B) As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.
>
> (C) Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result.

Ohio Rev. Code § 2745.01.

This is a statute at war with itself:  Subsection A provides for liability where the employer acted "with the intent to injure another *or* with the belief that the injury was substantially certain to occur" (emphasis added), but subsection B then defines "substantially certain" as a "deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death," thereby essentially eviscerating the phrase after "or" in subsection A.  In other words, using the definition of "substantially certain" provided in subsection B, subsection A limits liability to circumstances where the employer acts "with the intent to injure another" or "with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death."  So what appears at first glance as two distinct bases for liability is revealed on closer examination to be one and the same.

The Ohio courts have agreed with the foregoing interpretation of Ohio Revised Code § 2745.01.  In *Kaminski*, the Ohio Court of Appeals had this to say about the statute:

> When we consider the definition of "substantial certainty," it becomes apparent that an employee does not have two ways to prove an intentional tort claim as R.C. 2745.01(A) suggests.  The employee's two options of proof become:  (1) the employer acted with intent to injure or (2) the employer acted with deliberate intent to injure.  Thus, under R.C. 2745.01, the only way an employee can recover is if the employer acted with the intent to cause injury.

*Kaminski v. Metal & Wire Prods. Co.*, 886 N.E.2d 262, 269 (Ohio Ct. App. 2008) (quoted in *Kaminski*, 927 N.E.2d at 1079).  The Ohio Supreme Court agreed, holding that "the General Assembly's intent in enacting R.C. 2745.01, as expressed particularly in 2745.01(B), is to permit recovery for employer intentional torts only when an employer acts with specific intent to cause an injury."  *Kaminski*, 927 N.E.2d at 1079.

The Ohio Supreme Court went on to acknowledge that this new, statutory scope of liability is narrower than intentional-tort liability under Ohio common law.  *See Kaminski*, 927 N.E.2d at 1080 (noting that Ohio Revised Code § 2745.01 "intends to significantly restrict actions for employer intentional torts" and affirming the Ohio General Assembly's "power to alter, revise, modify, or abolish the common law as the General Assembly may deem necessary to further the common good" (internal quotation

marks omitted)). Specifically, whereas the common law allowed intentional-tort liability based on either specific intent or inferred intent, the new statutory scheme premises liability on specific intent alone. *See Stetter*, 927 N.E.2d at 1099-1100 ("It was the General Assembly's intent in enacting R.C. 2745.01, as expressed particularly in R.C. 2745.01(B), to permit recovery for employer intentional torts *only* when an employer acts with specific intent to cause an injury. . . . R.C. 2745.01 embodies the General Assembly's intent to significantly curtail an employee's access to common-law damages for what we will call a 'substantially certain' employer intentional tort." (emphasis in original) (citation omitted)); *Houdek v. ThyssenKrupp Materials N.A., Inc.*, ___ N.E.2d ___, 2012 WL 6553603, at *6 (Ohio 2012) ("[T]he General Assembly intended to limit claims for employer intentional torts to situations in which an employer acts with the 'specific intent' to cause an injury to another.").

The upshot is that tort-law remedies for workplace injuries in Ohio are limited to those resulting from the employer's deliberate intent to injure. For all other workplace injuries, the employee's sole avenue of redress is the worker's compensation system. *Houdek*, 2012 WL 6553603, at *6.

The specific-intent requirement is moderated, however, by subsection C of Ohio Revised Code § 2745.01, which sets up a rebuttable presumption of intent to injure when the employer deliberately removes an equipment safety guard or deliberately misrepresents a toxic or hazardous substance. Much of the controversy in the present case centers on the application of subsection C.

## C. The district court's analysis

The district court's analysis proceeded in two steps. First, the court held that Ford had rebutted the presumption of intent to injure arising under Ohio Revised Code § 2745.01(C) by introducing undisputed evidence that it did not intend to injure Rudisill. The court then held that, in the absence of the presumption, Rudisill had failed to introduce sufficient evidence to raise a triable issue of fact.

In holding that Ford had rebutted the presumption, the district court relied on the following two key factors:

*1. There had been no substantially similar incidents.* Christina Redella, Senior Safety Engineer at the Plant, submitted an affidavit averring that "[p]rior to Norman Rudisill's accident in February 2007, there were no reported incidents or accidents in which any employees were injured from clamps slipping off of flasks or from falling onto the shaker pan when removing flasks for repair." Rudisill, in turn, failed to counter Redella's affidavit by pointing to any evidence of substantially similar incidents that had occurred prior to his injury.

The district court found the absence of substantially similar accidents particularly significant in view of the millions of man-hours worked and the large amount of iron produced at the Plant. Mark Tomkovich, the Controller at the Plant, submitted an affidavit based on Ford's electronic and physical records attesting that a total of 72,995,687 man-hours had been worked at the Plant from 1994 through 2006 and that the Plant had produced at least 16,640,925 tons of iron since its opening in 1952. Given the absence of a single substantially similar incident during the entire history of the Plant, the district court concluded that "Ford had no reason to believe that the process it had in place to remove drag flasks for repair was dangerous and, therefore, Ford could not have intended to injure Mr. Rudisill."

*2. Rudisill and his coworkers did not think the flask-removal process was dangerous.* In addition to the absence of any substantially similar incident, the district court noted that neither Rudisill nor any of his coworkers had considered the flask-removal process to be dangerous. Rudisill testified during his deposition that, prior to the incident, he had never had "any problems" (let alone injuries or incidents) "with the clamps coming off at the flask or a car top while removing it from the line." He also testified that the process "worked," and that he had never known of anyone else who had fallen into the pit. Scott O'Neill, Rudisill's coworker who was present at the incident, testified to the same effect.

Rudisill further testified that, as Team Leader, he would have reported to management had he believed the flask-removal process to be dangerous, and he would not have allowed other employees to engage in the process.  He instead allowed other employees to take part and did not make a report because he did not perceive any danger.  Nor did any other employee ever voice a safety concern or report a dangerous condition to management about the flask-removal process.

Finally, Rudisill testified that he did not have "any reason to think" that Kevin Wrobleski,  the foreman who was Rudisill's immediate supervisor, "wanted anybody to get hurt."  The district court concluded that "[a]ll this undisputed evidence rebuts the presumption that Ford intended to injure an employee by the process of removing a drag flask for repair."

Having concluded that Ford had rebutted the presumption, the district court next considered whether, in the absence of any presumption, Rudisill's evidence was sufficient to create a triable issue of fact.  The court considered Rudisill's allegations—that Ford failed to issue him protective equipment in violation of Ohio Administrative Code § 4123:1-5-17, and that Department of Labor inspections between 1998 and 2010 had reported "a laundry list of substandard conditions" at the Plant—and found them wanting.  With respect to the alleged failure to issue protective equipment, the court found that such failure was at most evidence of negligence, not of deliberate intent to injure.  It also found that the prior Department of Labor citations did not constitute evidence of Ford's deliberate intent to injure because none of the citations concerned incidents or conditions substantially similar to those that caused Rudisill's injury.

Ultimately, the district court granted summary judgment for Ford on the intentional-tort claim after concluding that Rudisill's submissions "do not set up any material factual dispute."  The loss-of-consortium claim by Rudisill's wife was then dismissed as derivative.

**D. Rudisill's claims of error**

### *1. Whether Ford rebutted the intent-to-injure presumption*

Rudisill claims that the district court erred in holding, as a matter of law, that Ford had rebutted the presumption of intent to injure. He maintains that the question should have gone to a jury. Rudisill's argument is twofold. He first contends that, as a general matter, "whether a party has rebutted a presumption is an issue for the trier of fact." Second, Rudisill claims that, under the particular circumstances of this case, he presented sufficient evidence to create a jury question as to the applicability of the presumption.

Rudisill cites several Ohio decisions in support of the proposition that the question of whether a presumption has been rebutted must always go to the jury. But none of these decisions stand for the proposition that the issue of whether a presumption has been rebutted is *categorically* a jury question; they simply hold that, in the particular circumstances of those cases, a triable issue of fact was present. *See Dudley v. Powers & Sons, LLC*, No. WM-10-015, 2011 WL 1590252, at *3 (Ohio Ct. App. Apr. 22, 2011) (holding that, where the only evidence presented by the defendant to rebut the intent-to-injure presumption under Ohio Revised Code § 2745.01(C) was an affidavit from its manufacturing engineer attesting that no harm had been intended, the issue of whether the presumption had been rebutted was for the jury to decide); *Zemanek v. Meseroll*, No. C-75499, 1976 WL 189914, at *1-3 (Ohio Ct. App. Aug. 23, 1976) (holding that, where one minor injured another minor while shooting BB guns at each other during a game of "war," and no evidence was presented as to whether the minors participated in the game "with intelligence and proficiency" rather than "thoughtlessly," the applicability of the rebuttable presumption that minors are "incapable of forming the necessary judgment for self care" presented a genuine dispute of material fact).

Indeed, there are several Ohio decisions—including one addressing the very presumption in Ohio Revised Code § 2745.01(C)—that hold as a matter of law that the applicable presumption was rebutted. *See, e.g.*, *Shanklin v. McDonald's USA, LLC*, No. 2008 CA 00074, 2009 WL 154034, at *7 (Ohio Ct. App. Jan. 20, 2009) (holding that

where an employee food preparer was injured by contact with an exposed inner wire of a microwave oven whose housing unit had been removed, the defendant rebutted the intent-to-injure presumption of § 2745.01(C) by putting forth uncontradicted evidence that the housing unit had been removed for repair and was replaced after repair, and that the employee was not required to work with the microwave for food preparation in the interim); *Meek v. Cowman*, No. 07CA31, 2008 WL 683972, at *3-5 (Ohio Ct. App. Mar. 7, 2008) (holding that the defendant rebutted the presumption that the testator was incompetent by putting forth several uncontroverted affidavits confirming the testator's mental alertness around the time that he prepared his will); *State ex rel. Benjamin v. Ohio Dep't of Rehab. & Corr.*, No. 06AP-158, 2007 WL 1470464, at *2 (Ohio Ct. App. May 22, 2007) (holding that uncontroverted evidence of an incorrect service address rebutted the presumption of proper service of process).

Rudisill has cited only one decision that arguably supports the proposition that the issue of whether a presumption has been rebutted is categorically for the jury to decide. In that case, the Ohio Court of Appeals held that the intent-to-injure presumption was inapplicable because the ventilator system that had been removed from a conveyor belt did not constitute an "equipment safety guard" within the meaning of the statute. *Zuniga v. Norplas Indus., Inc.*, 974 N.E.2d 1252, 1258 (Ohio Ct. App. 2012). The court therefore affirmed the trial court's grant of summary judgment for the defendant on the intentional-tort claim. In dicta, however, the court set forth what it thought would be the proper analysis if the intent-to-injure presumption had in fact arisen:

> Once a statutory presumption of employer intent to injure is established, rebuttal of that presumption necessarily involves some weighing of evidence. This would preclude summary judgment on such an issue because weighing evidence or choosing among reasonable inferences is not permissible in a summary judgment analysis.

*Id.* at 1257.

We find this reasoning unpersuasive. Deciding whether the intent-to-injure presumption has been rebutted does not "necessarily" require the weighing of evidence.

Suppose, for example, that, as in *Shanklin*, the evidence is unequivocal and uncontroverted that the safety guard on a piece of equipment was removed for repair, that the employee was not required to work with the equipment in such condition, and that there is no evidence that anybody intended any harm. There would be no evidence to weigh under these circumstances. All the evidence would point in one direction and the answer would be clear as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (holding that the inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Of course, *if* the evidence adduced by a defendant to rebut the presumption is weak, or *if* a plaintiff presents substantial countervailing evidence, then resolution of the issue would require the weighing of evidence that would render summary judgment improper. *See id.* at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). But that is a big "if." As the Ohio decisions cited above demonstrate, not every case involves the weighing of evidence; sometimes the answer is clear as a matter of law. The dictum in *Zuniga* that deciding whether the presumption has been rebutted "necessarily involves some weighing of evidence," 974 N.E.2d at 1257, is therefore incorrect. Instead, deciding whether a jury question is presented depends on the circumstances of the particular case and the evidence before the court.

Rudisill essentially acknowledges this point when he purports to distinguish the Ohio decisions that resolved the presumption-rebuttal issue as a matter of law by arguing that "none of [those] cases . . . required the court to weigh any evidence." So Rudisill apparently recognizes that the question of whether the presumption-rebuttal issue may be decided as a matter of law is not susceptible to a single categorical answer, but instead must be answered by reference to the evidence before the court in the particular case at hand.

In rejecting the dicta in *Zuniga*, we also note that the question of whether summary judgment is appropriate is a question of federal law, not state law.

*See generally* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 ("[I]n diversity-of-citizenship actions questions relating to the availability of summary judgment, such as whether there is a disputed issue of fact that is sufficient to defeat the motion, are procedural and therefore governed by Rule 56, rather than by state law."); *see also Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008) (holding that "the Michigan provision [governing the circumstances under which a jury question is created in certain tort cases] is procedural, and therefore a plaintiff is not entitled to argue her case to a jury merely because she has satisfied its requirements," but must instead "produce evidence creating a genuine issue of material fact, as required by Rule 56(c)").

In the present case, the parties appropriately cite to federal authorities in stating the black-letter summary-judgment standard. Once the black-letter standard is stated, however, they cite exclusively to Ohio authorities in arguing about whether the presumption-rebuttal issue should go to the jury or be decided by the court. The parties' citations to Ohio decisions discussing the availability *vel non* of summary judgment, though certainly helpful in clarifying Ohio substantive law, are not binding on us with respect to whether sufficient evidence has been adduced to survive summary judgment. But as the above discussion demonstrates, the Ohio decisions cited by the parties (with the exception of *Zuniga*) appear to be in conformity with the federal standard.

Returning now to the key point that the presumption-rebuttal issue may in some cases be properly decided as a matter of law by the court, the question becomes whether that was the correct decision in the present case. We conclude that it was. As explained above, the district court took stock of the pertinent evidence—the lack of any prior substantially similar incidents despite the hundreds of millions of hours worked at the plant; the lack of any prior citations or complaints involving substantially similar conditions; the admission by Rudisill and other employees involved in the flask-removal process that they did not think the process was dangerous; the fact that Rudisill had routinely engaged in the process hundreds of times without incident; Rudisill's acknowledgment that he would have reported the condition if he had thought the process

was dangerous and, as Team Leader, would not have let his coworkers engage in the process; and Rudisill's concession that he had no reason to think that his supervisor at Ford intended to harm him—and concluded that Ford had rebutted the presumption. We find no error in this conclusion.

Instead of directly responding to the above evidence, Rudisill faults the district court for relying on the testimony of several Ford employees to the effect that "workers' safety is important to Ford and that Ford does not deliberately intend to injure its employees." He argues that the assessment of such generalized statements requires a credibility determination that should have been left to the jury.

Rudisill is correct to the extent that the self-congratulatory affidavits stating that Ford is committed to workers' safety would alone not be sufficient to rebut the presumption. *See Dudley v. Powers & Sons, LLC*, No. WM–10–015, 2011 WL 1590252, at *3 (Ohio Ct. App. Apr. 22, 2011) ("The testimony of a Powers employee [that there was no intent to harm] cannot be weighed so heavily to say that reasonable minds could not disagree on the issue of intent."). But his argument as to the effect of these affidavits in the present case is misplaced because, even though the district court mentioned the "we love safety" affidavits, it did not attach any particular importance to them and did not rely on them in reaching its decision. Instead, the court relied on the hard, uncontroverted evidence that has been discussed above. The affidavits are therefore beside the point.

Rudisill also argues that "to find that Ford rebutted the presumption, as the District Court did here, suggests that, in order to invoke the presumption in the first instance, Mr. Rudisill was required to present proof that the equipment safety guards were removed with the intent to injure. This undermines the very purpose of Ohio Rev. Code § 2745.01(C)."

We are not persuaded by Rudisill's interpretation of the district court's ruling. A plaintiff is obviously not required to adduce evidence of an intent to injure in order to invoke the presumption of intent of injure; that is the point of a *presumption*. But once the presumption has been invoked, a defendant may rebut it by marshaling evidence that

there was in fact no intent to injure; that is the point of a *rebuttable* presumption. *See* Ohio Rev. Code § 2745.01(C) ("Deliberate removal by an employer of an equipment safety guard . . . creates *a rebuttable presumption* that the removal . . . was committed with intent to injure . . . ." (emphasis added)); *Shanklin*, 2009 WL 154034, at *6 ("[W]e find [that] the evidence presented rebuts the presumption that the removal of the housing unit was committed with the intent to injure the employee.").

The district court's ruling that Ford had successfully rebutted the intent-to-injure presumption by adducing evidence of a lack of intent to injure does *not* mean that Rudisill was required to present evidence of an intent to injure in order to invoke the presumption in the first place. There is a significant difference between giving the defendant an opportunity to rebut a presumption and a finding that no presumption arose to begin with. Once the rebuttable presumption has been successfully invoked, the burden is on *the defendant* to rebut it by introducing evidence of the lack of an intent to injure; by contrast, in the absence of a presumption, the burden would be on *the plaintiff* in the first instance to introduce evidence of the intent to injure. *See* Ohio R. Evid. 301 ("[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption . . . ."); *Ferrando v. Auto-Owners Mut. Ins. Co.*, 781 N.E.2d 927, 947 (Ohio 2002) (affirming that, once a presumption arises, the opposing party "bears the burden of presenting evidence to rebut" it).

Ohio law, by the way, governs the effect of the presumption in this case. *See* Fed. R. Evid. 302 ("In a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision."). This is in contrast to federal law governing the procedural question of whether summary judgment is appropriate in a particular case. (*See supra* for authorities on this latter point.)

For all the reasons discussed above, the district court correctly held that Ford had successfully rebutted the presumption. We will therefore turn to Rudisill's remaining issue on appeal.

**2.  *Whether, in the absence of a presumption, there existed a triable issue of fact***

When a presumption is rebutted, the case proceeds as if the presumption had never arose.  *See, e.g.*, *In re Guardianship of Breece*, 184 N.E.2d 386, 394 (Ohio 1962) ("Where the presumption is a rebuttable one, as in this case, the production of evidence disputing or contrary to the presumption causes the presumption to disappear where such evidence to the contrary either counterbalances the presumption or even when it is only sufficient to leave the case in equipoise."); *Horsley v. Essman*, 763 N.E.2d 245, 249 (Ohio Ct. App. 2001) ("We have previously characterized the effect of rebutting the presumption as 'bursting the bubble,' with the case then proceeding as if the presumption had never arisen.").  The inquiry thus becomes whether the plaintiff has adduced sufficient evidence to allow a reasonable jury to conclude that every element of the plaintiff's claim has been met.  In the present case, the focus is on the intent-to-injure element.

Rudisill's appellate briefs raise the following factors as evidence of Ford's alleged intent to injure:  (1) allowing employees to work over an exposed pit of molten metal without any guards to shield the pit and without any safety equipment; (2) the testimony of two of Ford's safety engineers regarding Ford's knowledge of the dangerous condition; (3) the Occupational Safety and Health Administration (OSHA) guidelines or warnings about the hazards associated with exposed floor openings; and (4) Ford's failure to conduct a job-safety analysis.  We will examine each of these factors in turn to see whether, taken together, they would enable a reasonable jury to conclude that Ford intended to injure Rudisill.

*1. Working conditions*.  As an abstract matter, having people hammer at a heavy iron flask suspended in the air by iron clamps while standing near the edge of an unguarded pit of molten metal without wearing any special protective equipment seems dangerous.  And, in view of Rudisill's unfortunate incident, the process seems even more dangerous with the benefit of hindsight.

But the relevant inquiry is not about dangerousness; it is about the deliberate intent to injure. And although one can hypothesize working conditions so dangerous as to raise a reasonable inference of an intent to injure, such an inference does not arise in the present case. To the contrary, even though the flask-removal process might seem dangerous to an armchair observer with the benefit of hindsight, it did not seem so to any of the Ford employees who had performed the task innumerable times for many years. None of these employees, including Rudisill himself, testified that he considered the process dangerous prior to the incident in question. Nor did a single employee ever complain, warn, or raise any red flags about the process.

Indeed, Rudisill testified that, as a Team Leader, he would report any dangerous condition he saw to the foreman; that he had reported other dangerous conditions to the foreman in the past; that he would not "get into trouble" for reporting dangerous conditions; that the foreman was "responsive" and there was no reason to think that the foreman wanted anyone to get hurt; and that he had never required another employee to perform a task that he thought was dangerous. Yet Rudisill had never complained to anyone about the flask-removal process and never instructed other Ford employees not to engage in the process. To the contrary, as far as he was concerned, the process "worked" and he had never had "any problems" with it.

Other employees similarly testified that they had never complained about the process, never heard of anyone complaining about it, and never considered the process to be problematic or unsafe. In light of all this uncontroverted testimony, as well as the lack of any similar incidents in the past, the conditions of the flask-removal process at the time that Rudisill was injured would not enable a reasonable jury to conclude that Ford intended to harm him.

We would add that this is not a case where a company decides to throw safety to the wind and do whatever it takes to increase production. Rather, there was a specific functional purpose for temporarily removing the guard rails surrounding the pit. The removal enabled the employees to access the drag flask so that they could clean off the run-out. Rudisill conceded at oral argument that the guard rails' removal was necessary

for this purpose. Of course, the fact that Ford's actions had a specific functional purpose does not automatically exempt the process from intentional-tort analysis. And we know, in hindsight, that the incident would have been avoided if Ford had designed alternative means (such as the later-added metal grates) to guard the pit while the guard rails were temporarily removed. But the fact that the guard rails' temporary removal was necessary in order to clean the drag flask from run-out is an additional factor evincing a purpose other than an intent to injure Rudisill. *Cf. Shanklin v. McDonald's USA, LLC*, No. 2008 CA 00074, 2009 WL 154034, at *7 (Ohio Ct. App. Jan. 20, 2009) (noting that removing the microwave's housing unit was necessary to repair the microwave, and the housing unit was replaced after the repair).

*2. The testimony of two Ford employees.* Rudisill nevertheless claims that two Ford employees testified in their depositions that "Ford was aware of the dangers posed by exposed floor openings and that the floor opening in which Mr. Rudisill was injured should have been guarded with a floor grate to protect Mr. Rudisill from falling into the pit."

The first part of Rudisill's contention is not supported by the record. Nowhere in the deposition pages cited does either employee say that Ford "was aware" of any dangers. As for the rest, here are the pertinent excerpts from the depositions of the two employees in question (Senior Safety Engineer Christina Redella and Safety Engineer Jason Kriebel):

> Q. [R]emoving the drag flask from this operation on or about February 2nd, 2007 required the removal of the long barrier guard, true?
> A. It did. . . .
> . . .
> Q. And we didn't have a grate in place, true?
> A. Correct.
> Q. So that was a required aspect of the job in removing the drag flask?
> A. It should have been.
> Q. I'm sorry?
> A. The grating, it should have been.

(Redella Dep. 74-75)

> Q. Putting a grate over the hole before the flask is being removed and after the vertical rail guard is removed is not a real complex solution; can we agree with that?
> A. I would agree. Most cases it's probably not a real mind boggling task or action to take.

(Kriebel Dep. 123)

Redella's statement that the grating "should have been" a required aspect of the job is nothing more than her opinion, in hindsight, of what the best safety practice should have been. Such an opinion is at most evidence of negligence (and not particularly strong evidence at that), and certainly would not be sufficient to enable a reasonable jury to find a deliberate intent to injure.

Kriebel's testimony is even less relevant. Whether the installation of metal grates would be "complex" or "mind boggling" is in no way probative of Ford's intent to injure. In sum, the testimony of the Ford employees identified by Rudisill would not permit a reasonable jury to find that Ford intended to injure him.

*3. OSHA guidelines or warnings.* Rudisill's argument about OSHA is less than clear. His opening brief states that "Ford had been warned of the hazards associated with exposed floor openings during an OSHA wall-to-wall review in 1998—nine years prior to Mr. Rudisill's accident." But Rudisill never actually cites to or provides any OSHA documents. The same goes for Ford's Guidelines, Responsibilities, and Safe Practices ("GRASP") handbook, which is often referenced but never specifically cited or provided. We are unable to draw any conclusions from these documents without seeing their contents.

The only clue provided by Rudisill as to the import of either OSHA or GRASP is through the deposition testimony of the two Ford safety engineers. The pertinent testimony from Kriebel is to the effect that he "believe[s]" the GRASP handbook "does mention" something about "exposed floor openings" and "believe[s]" that GRASP "instruct[s] employees not to work around exposed floor openings," but he is "not sure of the specific verbiage." No reasonable jury could conclude on the basis of such equivocal testimony that Ford intended to injure Rudisill. Even assuming that the

"exposed floor openings" purportedly discussed in the GRASP handbook include the type of pit that Rudisill fell into, the foregoing testimony is utterly unclear as to what the handbook actually said. Moreover, the failure to follow an instruction in a safety handbook is at most evidence of negligence, not evidence of a specific intent to injure.

Rudisill also cites the deposition testimony of Redella to the effect that, at some point in 1998, OSHA told Ford to "have all exposed floor openings covered and/or guarded." Again, this is at most evidence of negligence. The general (and rather unremarkable) acknowledgment that unguarded floor openings might be dangerous does not show that Ford intended to injure Rudisill in requiring him to perform the specific flask-removal task at issue in the present case. We thus conclude that Rudisill's vague references to OSHA and GRASP cannot supply the basis for a reasonable jury to find that Ford intended to injure him.

*4. Job-safety analysis.* The final factor raised by Rudisill to support his claim of an intent to injure is based on references to Ford's failure to "perform a job safety analysis." But Rudisill is not specific as to what sort of analysis he thinks that Ford should have performed. Moreover, he has presented no evidence that would connect a presumed failure to conduct a job-safety analysis to a deliberate intent to injure him.

In sum, the evidence taken from all four factors together would not enable a reasonable jury to conclude that Ford acted with the deliberate intent to injure Rudisill. Because such intent is an essential element of an intentional-tort claim under Ohio Revised Code § 2745.01, summary judgment for Ford was properly granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Although this result might seem harsh to an injured employee like Rudisill, it is the result of reasoned public policy. The "social bargain" of workers' compensation is a two-way street: True, employees give up the ability to bring tort claims on anything less than a demanding showing of intent to injure. But in turn they obtain compensation

for a variety of injuries, regardless of fault, for which the common law provided no remedy.  The tradeoffs inherent in Ohio's workers' compensation system for both employers and employees are well described by the Ohio Supreme Court in *Kaminski v. Metal & Wire Products Co.*, 927 N.E.2d 1066, 1071-72 (Ohio 2010), and *Stetter v. R.J. Corman Derailment Services*, 927 N.E.2d 1092, 1104, 1107-09 (Ohio 2010).  One might argue as a matter of policy that this bargain is too one-sided; that the employees got the short end of the stick.  But such arguments, whatever their merit, should be addressed to the Ohio legislature rather than to the courts.  As it is, the Ohio statute requires evidence of the deliberate intent to injure, and there is no such evidence in the present case.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.