NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0493n.06

No. 15-2022

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 22, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| GLORIA BARNES, as personal representative of the Estate of A.D. Barnes, | ) ) ) | |
| Plaintiff-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| SUN CHEMICAL CORPORATION, | ) ) | |
| Defendant-Appellee. | ) | |

BEFORE: KEITH, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Gloria Barnes, as personal representative of the Estate of A.D. Barnes, appeals the district court's grant of summary judgment to defendant Sun Chemical in this wrongful-death action arising from A.D. Barnes' lethal employment accident. After Sun Chemical removed the case to federal court based on diversity jurisdiction, 28 U.S.C. § 1332(a), the district court held the Estate's action barred by the Michigan Workers Disability Compensation Act's, Mich. Comp. Laws Ann. § 418.131(1), exclusive-remedy provision, rejecting the Estate's argument that the case falls within the statute's intentional-tort exception.[1] We agree and **AFFIRM**.

---

[1] The district court also denied as moot the Estate's cross-motion for summary judgment.

**I.**

Sun Chemical produces pigment used in making ink. As part of the production process, forklifts are used to move bags of press cake[2] back and forth from the warehouse floor to a mezzanine level for drying. On November 4, 2011, forklift driver Bruce Pontius (Pontius), who was operating a forklift on the warehouse level, lifted several 1600-pound bags of press cake up to the mezzanine. Kathryn Brown, who was responsible for operating a forklift on the mezzanine level that day, went up to the mezzanine from the warehouse floor when Pontius called to tell her he was sending up bags. When she arrived on the mezzanine, she saw that Pontius had put two or three bags of press cake "up there," and that one was "off the [pallet]." (Brown Dep., PID 603, p. 12; PID 618-19, pp. 71-73.) Brown moved the first bag and came back for the second; when she tried to pull it back, the bag fell. Brown sounded the horn on her forklift to warn anyone who might be on the warehouse floor. When she returned to the warehouse floor, she saw that the bag had fallen on someone. An announcement was made over the PA system that there was a "man down;" employees moved the bag off Barnes and administered CPR and oxygen, and paramedics and police arrived. (*See* Gesiakowski Dep., PID 863, pp. 33-34; *see also* Internal Incident Report, PID 399.) Barnes did not survive.

**II.**

We review de novo a district court's order granting summary judgment. *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Mitchell v. Fankhauser*, 375 F.3d 477, 479 (6th Cir. 2004). In determining whether summary judgment is proper, we "must view all

---

[2] Press cake is pigment that is not fully dried.

evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Because this case arises under the district court's diversity jurisdiction, we apply Michigan law, looking to decisions of the Michigan Supreme Court, *see Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014), and to Michigan Court of Appeals decisions "unless it is shown that the [Michigan Supreme Court] would decide the issue differently," *see In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005).

Under the Michigan Worker's Disability Compensation Act (WDCA), "worker's compensation is the exclusive remedy for all on-the-job injuries, except for injuries intentionally inflicted by the employer." *Gray v. Morley*, 596 N.W.2d 922, 924 (Mich. 1999); *see also* Mich. Comp. Laws Ann. § 418.131(1). The WDCA's intentional-tort exception provides:

> An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.

Mich. Comp. Laws Ann. § 418.131(1). The question "[w]hether the facts alleged by plaintiff are sufficient to constitute an intentional tort is a question of law for the . . . court." *Herman v. City of Detroit*, 680 N.W.2d 71, 76 (Mich. Ct. App. 2004) (quoting *Gray*, 596 N.W.2d at 922).

The exception's first sentence requires a showing that the employer "deliberately act[ed] or fail[ed] to act with the purpose of inflicting an injury on the employee." *Travis v. Dreis & Krump Mfg. Co.*, 551 N.W.2d 132, 142 (Mich. 1996) (opinion of Boyle, J.); *id.* at 150 (opinion of Riley, J., concurring in the test established by the lead opinion). The second sentence provides a means of showing specific intent where there is no direct evidence of intent to injure,

by demonstrating the employer "has actual knowledge that an injury is certain to occur, yet disregards that knowledge." *Id.* at 146. The Estate proceeds under the second theory, asserting that Sun Chemical disregarded actual knowledge that an injury was certain to occur.

## III.

### A.

At the time of the incident, Sun Chemical forklift drivers used the "pushback method"—a technique wherein the forklift "push[es] the proceeding pallet forward with the subsequent pallet"—to put bags of press cake on the mezzanine. (Nuttall Dep., PID 723, pp. 14-15; Hendryx Dep., PID 774, 800-01.) Pontius testified at his deposition that he had received training on how to use this method safely, and Michigan Occupational Safety and Health Administration (MIOSHA) senior safety officer Christopher Morano (Morano) testified that this technique could be performed safely. However, Scott Hendryx (Hendryx), former Operations Manager at Sun Chemical, testified that the pushback method could lead to safety hazards. Further, according to former Sun Chemical safety, health, and environmental manager Evert Vander Berg (Vander Berg), forklift drivers were prohibited from using this method on "dry surface," and instead were supposed to put the bags on a conveyor.

#### 1. Safety Measures

At the time of the Barnes incident, there was a safety gate on the mezzanine level that could be opened by a pull-cord on the warehouse level and left open while forklift drivers transferred bags of press cake to and from the mezzanine. Employee Ray Collins (Collins) testified on deposition that although Sun Chemical installed the gate sometime after 1999—after he was hit in the leg by a falling bag of press cake—the gate did not work properly, and thus was

always left open.  However, according to Pontius, although the gate failed to work "a couple times," someone usually inspected it if it was broken.  (*See* Pontius Dep., PID 590, pp. 82-84.)

The warehouse also had a "bright blue strobe light" to notify employees when the gate was open.  (*Id.*, PID 588-89, pp.76-77.)  Although Sun Chemical contends it installed the light after the Collins incident in 1999, Collins testified at his deposition that there was a warning light in place at the time of his incident, but he had never seen it work.  The record contains conflicting testimony about whether the light was working immediately after the bag of press cake fell on Barnes.  Scott Foster, a Muskegon County deputy sheriff who responded to the scene, stated that Pontius and another man told him the light was not working, but when he checked the light, it was working "sporadic[ally]."  (Foster Dep., PID 627, p.6; 629, p. 16; 632-33, pp. 28-29; 633-34, pp.32-33).  Pontius, however, testified at his deposition that the light always worked, and that he saw it working on the day of the incident, before the accident.  Morano—the MIOSHA safety officer who investigated the incident three days later—testified at his deposition that he inspected the light and it was working.  Similarly, Vander Berg and Hendryx remembered the light working immediately after the incident.

Finally, according to Sun Chemical, the company has long provided a designated pedestrian pathway, or "manway," on the warehouse floor, because employees are not supposed to walk through the designated forklift area.  Although there was a grind-and-mix and storage area under the mezzanine, employees could access it via the manway without walking through the forklift area.

Pontius testified during his deposition that about five years before the Barnes incident, employees received training to walk on the manway, not in the forklift area; however, he also explained that it was commonly known that employees walked in other areas on occasion.

Similarly, Brown testified that employees did not always use the manway, and that they walked in the area under the mezzanine "pretty much all the time." (Brown Dep., PID 612-13, pp. 48-50; PID 617, p. 65.) Three management-level employees—Vander Berg, Hendryx, and James Andrew Nuttall—testified during their depositions that they knew that employees walked through the restricted area, or had heard about it, but Vander Berg asserted employees had received oral warnings from supervisors for doing so, and Hendryx stated he asked employees not to do so.

The parties dispute whether the pedestrian walkway was marked at the time of the incident. According to Collins, it was not marked. But other employees and supervisors testified on deposition that the walkway was designated with a yellow line. Vander Berg testified that at the time, the line "may have been faded" or had objects stacked on top of it. (Vander Berg Dep., PID 692, p. 48; *see also id.* at PID 698, p. 69.) Nonetheless, Pontius testified that although the walkway was not marked with a sign, it was common knowledge that it existed and that employees were supposed to use it.

### 2. Barnes Incident

When he was struck by the falling bag, Barnes was walking in the forklift area, not on the pedestrian walkway. According to Sun Chemical, Barnes had no job duties on the warehouse floor where he was walking.

A Sun Chemical internal investigation identified the "root causes" of the incident as: 1) use of the pushback technique, causing the pallets to interlock and become unstable, 2) the operator on the mezzanine failing to notice the pallets were interlocked, 3) Barnes walking outside the designated area for foot traffic, and 4) the warning light flashing intermittently, with one to twenty-five second pauses between flashes. Hendryx also testified that the gate being left

open might have contributed to the incident, although he doubted that the gate would have stopped the bag from falling.

MIOSHA cited Sun Chemical for two "serious" violations as a result of the Barnes incident: 1) inadequate stacking as a result of the pushback method, and 2) inadequate standard barrier, meaning that although there was a barrier on the mezzanine, it was open while pallets were moved onto the mezzanine, and employees stated they sometimes looked over to view the area below, exposing them to a fall hazard.

### 3. Prior Incidents

In 1999, Collins was struck by a bag of press cake that fell from the mezzanine and landed on his leg; he was walking in the same area where Barnes was struck. Collins filed a written report about the incident with his supervisor and discussed the incident with Barnes. According to Sun Chemical, following this incident, the company installed the gate and blue strobe light.

Other objects had occasionally fallen from the mezzanines over the years. Pontius testified at his deposition that prior to the Barnes incident, he knew of two similar bags and a steel cage that had fallen from the mezzanines,[3] but that there were "usually years in between" incidents. (Pontius Dep., PID 594-95, pp. 100-03.) Brown stated that "not very many things fell," but that as often as weekly, she had seen small wooden pieces of a pallet fall from the mezzanine if a piece broke off. (Brown Dep., PID 609-10, pp. 36-38.) Of the supervisory or managerial employees, Hendryx testified that he had heard about Collins's incident, and that sometime around 2000 or 2001, an empty fiber drum—a heavy-duty cardboard container—had fallen off a mezzanine, but that he was unaware of any other incidents.

---

[3] One of these incidents appears to refer to the Collins incident.

Edward Wilkes, the Muskegon facility's Operations Manager, estimated that between Collins's incident and Barnes's incident, "Sun Chemical sent more than 66,000 pigment bags down from the yellow toner mezzanine and more than 43,200 bags back up" without incident, and attested that during that timeframe, there were "no other incidents where an individual was struck or nearly struck by any falling bags of pigment." (Wilkes Aff., PID 380-81.)

### 4. Expert Report

The Estate retained a safety engineer, Dr. James Miller (Miller), to review the incident. Miller's report concluded that Sun Chemical intentionally created the pallet lifting work task and its method; developed certain warnings upon "recognition of the hazard;" and it "appeared intentional" that Sun Chemical had not taken further safety precautions after being notified that its safety measures were not working. (Miller Report, PID 555.) Thus, he concluded that the accident was preventable, that it "was certain to occur at some point in time without additional preventative and/or remedial measures," and that Sun Chemical subjected its employees "to a recurring and dangerous condition when the yellow toner mezzanine gate was open and the first floor forklift was not present at the gate." (*Id.*)

**B.**

Viewing this evidence in the light most favorable to the Estate, we conclude that the district court did not err in granting summary judgment on the ground that there is no genuine dispute regarding the inapplicability of the intentional-tort exception to the WDCA's exclusive remedy provision. To avoid the exclusive-remedy provision, a tort plaintiff covered by the WDCA must show that the employer had actual knowledge that an injury was certain to occur, yet disregarded that knowledge. *Travis*, 551 N.W.2d at 146. Finding the Estate's failure to meet the certain-injury requirement dispositive, we address that requirement at the outset. The

standard for establishing that an injury is "certain to occur" is "extremely high," and requires that "no doubt exists with regard to whether [injury] will occur." *Id.* at 143. Consequently, "the laws of probability . . . play no part in determining the certainty of injury," nor are "conclusory statements by experts" that merely "parrot[] the language of the legal test" without scientific or factual support sufficient to demonstrate certainty of injury. *Id.* at 143-44. Additionally, whether a similar incident has occurred in the past is not dispositive. *See id.* at 143.

A court may find that an injury was certain to occur when "an employer subjects an employee to a continuously operative dangerous condition that it knows will cause an injury, yet refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured." *Id.* at 145. The Michigan Supreme Court has observed that "[a] continuously operative dangerous condition may form the basis of a claim under the intentional tort exception only if the employer *knows* the condition will cause an injury and refrains from informing the employee about it." *Giles v. Ameritech*, 660 N.W.2d 72, 73 (Mich. 2003) (emphasis in original). "An employer's awareness of a dangerous condition, or knowledge that an accident is likely, does not constitute actual knowledge that an injury is certain to occur." *Bagby v. Detroit Edison Co.*, 865 N.W.2d 59, 62 (Mich. Ct. App. 2014).

The Estate contends that Sun Chemical exposed employees to a continuously operative dangerous condition—the unsafe transfer of press cake from the warehouse floor to the mezzanine notwithstanding that employees walked on the warehouse floor below. However, the Estate fails to meet the high bar for showing certain injury set by the Michigan Supreme Court.

Although Sun Chemical was aware that employees used the pushback method and that it caused conditions under which a bag might fall, employees were told not to walk in the forklift area. Further, the record does not show that employees were regularly—or even more than

once—injured by falling objects; rather, it shows that accidents were infrequent, with only a few other large objects falling from mezzanines over the previous decade and smaller objects falling more frequently, and that tens of thousands of bags had been moved up and down without incident. Although the facts viewed in the light most favorable to the Estate suggest an injury may have been likely to occur, the required showing is not made "by demonstrating an employer's awareness that a dangerous condition exist[ed], or that an employer knew an accident was likely." *Johnson v. Detroit Edison Co.*, 795 N.W.2d 161, 168 (Mich. Ct. App. 2010) (per curiam) (alteration in original) (internal citation and quotation marks omitted); *see also Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 455-56 (6th Cir. 2002) (holding WDCA's intentional-tort exception did not apply where plaintiffs suffered injury after being instructed to remove carpet under which there was asbestos because the plaintiffs had shown only that the defendants knew of the general dangers of asbestos and did not provide proper training or safety equipment).

In addition, "[t]o be 'known' and 'certain,' an injury must spring directly from the employee's duties and the employee cannot have had the chance to exercise individual volition." *Bagby*, 865 N.W.2d at 63 (quoting *House v. Johnson Controls, Inc.*, 248 F. App'x 645, 648 (6th Cir. 2007)). An injury is not certain where "'the employee makes a decision to act or not act in the presence of a known risk,' because the employer cannot know in advance what the employee's reaction will be and what steps he will take." *Id.* at 63-64 (quoting *House*, 248 F. App'x at 648); *see also Herman*, 680 N.W.2d at 74, 77 ("The facts demonstrate that decedent's death was the result of decedent's momentary and tragic lapse in judgment, not the result of an intentional act by defendant.").

Here, although there is some evidence that supervisors knew employees walked in the restricted area, all supervisors and employees who were asked testified to knowing that there was an alternate path they could take instead of walking through that area. (*See* Collins Dep., PID 566, p. 39; Brown Dep., PID 612, pp. 48-49; Pontius Dep., PID 599, pp. 117-18; Vander Berg Dep., PID 692-93, pp. 46-50; Nuttall Dep., PID 272, pp. 31-32; Hendryx Dep., PID 785; Choura Dep., PID 834, p. 36; Gesiakowski Dep., PID 860, pp. 21-24, 865, p. 42.) And there is no evidence in the record that any supervisor instructed Barnes to walk in the restricted area, or that employees were forced to walk there to do their jobs.[4] Thus, this case is distinguishable from several on which the Estate relies, where employees were injured while performing job duties as they had been instructed or required. *See Howard-Johnson v. V & S Detroit Galvanizing, LLC*, 895 F. Supp. 2d 854, 863 (E.D. Mich. 2012); *Fries v. Mavrick Metal Stamping, Inc.*, 777 N.W.2d 205, 708-09, 717 (Mich. Ct. App. 2009). Further, that some supervisors may have known employees were "bypassing" the safety measures by walking through the forklift area does not suffice to establish an intentional tort. *See Smith v. Mich. Pallet, Inc.*, 872 N.W.2d 494 (Mich. 2015) (summarily reversing Court of Appeals determination that intentional-tort exception applied in part because evidence showed that the defendants "clearly knew that the safety system was being bypassed by the employees and that insufficient measures had been undertaken to address [it]" *Smith v. Mich. Pallet, Inc.*, No. 318702, 2015 WL 3477779, at *4 (Mich. Ct. App. June 2, 2015), *rev'd,* 872 N.W.2d 494 (2015)).

---

[4] Although Brown stated that she "had to" walk under the mezzanine for her job, and that it was a shortcut to the break room, she also testified that she never walked in the forklift area while the forklifts were operating. (*See* Brown Dep., PID 623, p. 92.) Moreover, Hendryx testified on deposition that although there was a grind-and-mix and storage area underneath the mezzanine, it could be accessed via the pedestrian pathway, and no testimony in the record disputes that.

Further, the record does not support the Estate's contention that Sun Chemical failed to warn employees about a dangerous condition. The Estate argues Sun Chemical failed to warn employees because the walkways were not marked, and even if they were, Vander Berg testified on deposition that the lines designating them might have been concealed on the day of the accident. However, every Sun Chemical employee asked about a pedestrian pathway in his or her deposition testified to knowing of its existence.[5] Moreover, Collins averred in an affidavit that he discussed his incident with Barnes, including the circumstances surrounding it and where it occurred; thus, Barnes would have been aware of the danger of walking in that area. *Cf. Bagby*, 865 N.W.2d at 64 (concluding there was no continuously operative dangerous condition where the plaintiff was electrocuted while changing the leads next to a bus because the defendant "did not refrain from telling [the plaintiff] or other employees that the line was energized and dangerous," there was testimony that two persons reminded the plaintiff on different dates that the lines were energized, and the plaintiff had received relevant training).[6]

Relying on *Johnson v. Detroit Edison Co.*, 795 N.W.2d at 170, the Estate argues that Sun Chemical "knew of the inherent dangers involved that would cause injury, knew its employees were taking their own insufficient precautions, as demonstrated by the knowledge of previous injuries and employee complaints, and yet did nothing to remedy the problem." (Barnes Br. 30

---

[5] For the same reason, the record belies the Estate's argument that testimony that the walkways were not marked creates a dispute of fact about whether designated walkways existed at the time of the incident.

[6] To the extent Barnes argues Sun Chemical failed to warn employees because the warning light was not working, this is similarly insufficient to establish applicability of the intentional-tort exception. *See Marion v. Wis. Elec. Power Co.*, 159 F. App'x 710, 715 (6th Cir. 2005) (rejecting the argument that starting a mill while warning system was not working would suffice to create issue of fact whether intentional-tort exception applied, concluding that starting the mill with the knowledge the system was faulty "might be negligent, perhaps even grossly so, but it would not be intentional under Michigan law").

(quoting *Johnson*, 795. N.W.2d at 170).) In *Johnson*, the plaintiff power-plant operators suffered burns when hot ash exploded on them as they were emptying bottom ash from a boiler. 795 N.W.2d at 165. Two of five ash gates on that boiler "had been broken for several months to a year," and there had been problems with some of the doors, causing ash to build up behind those gates and resulting in "a blowout, or explosion, of ash" through the defective boiler doors. *Id.* Employees regularly suffered minor burns from operating the boiler, one employee had suffered an injury seven or eight years earlier and reported it to management, and two or three years prior to that accident, another employee had been hospitalized due to a burn injury resulting from hot-ash spew. *Id.* There was also testimony that employees had expressed concerns about the broken gates to management, and that management acknowledged the danger. *Id.*

Unlike in *Johnson*, however, employees at Sun Chemical were not frequently injured by falling objects, nor does the record suggest that large objects fell frequently. Further, the *Johnson* court found relevant that according to the plaintiff, there was "no reasonable and effective means by which the employee [could] avoid the harm while still meeting his or her obligation to properly perform the work demanded by the employer." *Id.* at 171. Here, the record does not support the Estate's contention that employees were required to walk in the forklift area to perform their duties, or that Barnes or other employees would be unable to do their jobs without subjecting themselves to dangerous conditions.

Finally, relying on Miller's expert report, the Estate contends, "the subject incident was certain to occur at some point in time without additional preventative and/or remedial measures." (Barnes Br. 38.) However, knowledge of a general danger or likelihood of injury is insufficient to establish the intentional-tort exception. *Bagby*, 865 N.W.2d at 62. Nor are "conclusory statements by experts" that merely "parrot[] the language of the legal test" sufficient to

-13-

demonstrate certainty of injury. *Travis*, 551 N.W.2d at 143-44. Thus, although the record may demonstrate that Sun Chemical had knowledge of conditions that could be generally dangerous, there is no support in the record that the company had actual knowledge that an injury was certain to occur within the meaning of the intentional tort exception as interpreted by the Michigan Supreme Court. Because the Estate has failed to satisfy the certain-injury requirement, we do not address the other two prongs of the exception.

**IV.**

For these reasons, we **AFFIRM**.