[Cite as *Downard v. Rumpke of Ohio, Inc.*, 2013-Ohio-4760.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| RACHEAL DOWNARD, Administratrix of the Estate of Scott D. Johnson, | : | CASE NO. CA2012-11-218 |
| | : | |
| Plaintiff-Appellant, | : | O P I N I O N |
| | : | 10/28/2013 |
| - vs - | : | |
| | : | |
| RUMPKE OF OHIO, INC., et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2010-11-4739


Elizabeth Ann Yauch and Traci Combs-Valerio, 240 East State Street, Trenton, Ohio 45067, for plaintiff-appellant

Richard A. Hyde and Michael T. Gmoser, 6 South Second Street, Suite 311, Hamilton, Ohio 45011, for plaintiff-appellant

Keeting, Muething & Klekamp PLL, Michael T. Cappel and Louis F. Gilligan, One East Fourth Street, Suite 1400, Cincinnati, Ohio 45202, for defendant-appellee, Rumpke of Ohio, Inc.

Sutter O'Connell Co., Lawrence A. Sutter, Christina J. Marshall and James M. Popson, 3600 Erieview Tower, 1301 East 9th Street, Cleveland, Ohio 44114, for defendant-appellee, Rumpke of Ohio, Inc.

Sonnek & Howard, Ltd., Greg A. Goldblatt and Andrew D. Sonnek, 5725 Dragon Way, Suite 215, Cincinnati, Ohio 45227, for defendant, Bureau of Workers' Compensation

**S. POWELL, J.**

{¶ 1}   Plaintiff-appellant, Racheal Downard, Administratrix of the Estate of Scott D. Johnson, appeals from the Butler County Court of Common Pleas decision granting directed verdicts to defendant-appellee, Rumpke of Ohio, Inc., at the end of Downard's case-in-chief and again at the close of all evidence.  For the reasons outlined below, we affirm in part, reverse in part and remand for further proceedings.

{¶ 2}   At all times relevant, Scott Johnson served as a temporary employee at Rumpke's tire shredding facility located in St. Clair Township, Butler County, Ohio.  As a temporary employee, Johnson was assigned to load tires onto a tire shredder's inclined conveyor belt.  Once the tires were loaded onto the conveyor belt, the tires would then be dropped into a cutter box that housed the feeder gears and cutting knives that cut the tires into two-by-two inch pieces.  It is undisputed that as originally manufactured, the tire shredder at issue had an observation platform, a jib crane, as well as a hinged hood and interlock switch, all of which were removed, bypassed, or somehow modified by Rumpke.

{¶ 3}   On the afternoon of April 26, 2007, the overload beacon light on the tire shredder illuminated indicating a possible blockage of the drum discharge chute.  Noticing the overload beacon light, Craig Stidham, the foreman at the Rumpke tire shredding facility, stopped what he was doing and approached the tire shredder.  Although there is some dispute about what transpired next, all parties agree that Johnson then climbed onto the observation platform where he peered into the cutter box and confirmed that there was a tire blocking the discharge chute.  After learning of the blockage, Stidham threw the electrical disconnect switch in order to turn off the tire shredder.

{¶ 4}   Upon shutting down the machine, Stidham then turned and began talking with Joseph Retherford, another temporary employee assigned to work at Rumpke's tire shredding facility.  While speaking with Stidham, Retherford noticed that Johnson was no

longer on the observation platform. Thinking Johnson may have fallen off the side of the machine, Retherford went around to the side of the tire shredder, but was unable to locate Johnson. Sensing something was amiss, Stidham then climbed onto the inclined conveyor belt up to the edge of the cutter box where he found Johnson entangled within the tire shredder's feeder gears and cutting knives.

{¶ 5} Emergency crews were immediately dispatched to the scene to remove Johnson from the tire shredder, a process which took approximately 50 minutes to complete. During that time, Johnson remained conscious and proclaimed that he had fallen into the cutter box when he tried to unjam a tire from the machine. Johnson later reiterated the same to medical personnel as he was being transported to the hospital. After spending 52 days in the hospital, Johnson succumbed to his devastating injuries that had effectively removed the entire left side of his body. As a result of this incident, Johnson's estate received workers' compensation benefits totaling $387,761.29.

{¶ 6} On November 23, 2010, Racheal Downard, Johnson's niece and administratrix of Johnson's estate, filed suit against Rumpke asserting a claim of employer intentional tort under R.C. 2745.01, Ohio's Employer Intentional Tort statute. As part of her complaint, Downard argued Rumpke had violated R.C. 2745.01 by directing Johnson to operate the tire shredder after it had deliberately removed, bypassed, and modified the machine's safety devices and safety guards.

{¶ 7} After an exhaustive discovery process, this matter went to trial before a jury. The trial court issued a directed verdict for Rumpke at the close of Downard's case-in-chief finding that although the hinged hood on the tire shredder did constitute an "equipment safety guard" under R.C. 2745.01(C), the observation platform, jib crane, and interlock switch did not. The trial court also issued a directed verdict at the close of all evidence finding Rumpke had successfully rebutted the intent to injure presumption contained in R.C. 2745.01(C) as a

matter of law. The matter was then submitted to the jury which returned a verdict in favor of Rumpke on all remaining issues.

{¶ 8} Downard now appeals from the trial court's decisions granting a directed verdict to Rumpke at the close of her case-in-chief and at the close of all evidence, raising two assignments of error for review.

{¶ 9} Assignment of Error No. 1:

{¶ 10} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT WHEN IT GRANTED DEFENDANT-APPELLEE'S MOTION FOR DIRECTED VERDICT BY FINDING DEFENDANT-APPELLEE SUFFICIENTLY REBUTTED THE PRESUMPTION CONTAINED IN R.C. 2745.01(C).

{¶ 11} Assignment of Error No. 2:

{¶ 12} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT WHEN IT GRANTED DEFENDANT-APPELLEE'S MOTION FOR DIRECTED VERDICT DETERMINING WHAT WAS NOT AN EQUIPMENT SAFETY GUARD FOR PURPOSES OF THE PRESUMPTION CONTAINED IN R.C. 2745.01(C).

{¶ 13} In her two assignments of error, Downard argues the trial court erred by granting Rumpke a directed verdict at the end of her case-in-chief by finding the tire shredder's jib crane, observation platform, and interlock switch were not "equipment safety guards" as that term is used in R.C. 2745.01(C), Ohio's Employer Intentional Tort statute. Downard also argues the trial court erred by granting Rumpke a directed verdict at the close of all evidence by finding Rumpke had successfully rebutted the intent to injure presumption of R.C. 2745.01(C) as it relates to the deliberate removal of the tire shredder's hinged hood. Because these arguments are interrelated and address a multitude of issues regarding the application of Ohio's Employer Intentional Tort statute, we will address Downard's two assignments of error together.

### Civ.R. 50(A)(4) and the Directed Verdict Standard of Review

{¶ 14} The standard for granting a directed verdict is set forth in Civ.R. 50(A)(4), which provides:

> When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 15} In ruling on a motion for directed verdict, "[t]he trial court need not consider either the weight of the evidence or the credibility of the witnesses[.]" *Collins v. Admr. Bur. Of Workers' Comp.*, 12th Dist. Madison No. CA2006-12-054, 2007-Ohio-5634, ¶ 14; *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119 (1996). In turn, "[w]hen the party opposing a motion for a directed verdict has failed to adduce any evidence on the essential elements of the claim, a directed verdict is appropriate." *Nieman v. Bunnell Hill Development Co, Inc.*, 12th Dist. Butler No. CA2009-04-109, 2010-Ohio-1519, ¶ 25. In other words, "[w]here there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, it is inappropriate to grant the motion for a directed verdict." *Rockwood v. West Chester Nursing and Rehab. Residence, L.L.C.*, 12th Dist. Butler No. CA2006-10-250, 2007-Ohio-7071, ¶ 9, citing *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 109 (1992).

{¶ 16} A trial court's decision to grant a motion for a directed verdict involves a question of law, and therefore, an appellate court's review of that decision is de novo. *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, ¶ 22, citing *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4. "De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial."

*Lasley v. Nguyen*, 172 Ohio App.3d 741, 2007-Ohio-4086, ¶ 18 (2d Dist.), citing *Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116, 119-120 (1980). Thus, the trial court's decision to grant a motion for a directed verdict is not granted any deference by the reviewing court. *Moore v. Kettering Mem. Hosp.*, 2d Dist. Montgomery No. 22054, 2008-Ohio-2082, ¶ 19, citing *Brown v. Scioto Cty. Bd. of Commissioners*, 87 Ohio App.3d 704, 711 (4th Dist.1993).

**Ohio's Employer Intentional Tort Statute**

{¶ 17} Generally, actions for injuries sustained in the course of employment must be addressed within the framework of Ohio's workers' compensation statutes. *Roberts v. RMB Ents., Inc.*, 197 Ohio App.3d 435, 2011-Ohio-6233, ¶ 20 (12th Dist.); *Zuniga v. Norplas Indus. Inc.*, 6th Dist. Wood Nos. WD-11-066 and WD-11-067, 2012-Ohio-3414, ¶ 14. However, in limited circumstances when an employer's conduct is sufficiently egregious to rise to the level of an intentional tort, an employee may institute an intentional tort claim against his employer pursuant to Ohio's Employer Intentional Tort statute codified in R.C. 2745.01. *See Barton v. G.E. Baker Constr., Inc.*, 9th Dist. Lorain No. 10CA009929, 2011-Ohio-5704, ¶ 7; *see also Ferryman v. Conduit Pipe Prods. Co.*, 12th Dist. Madison No. CA2007-02-007, 2007-Ohio-6417, ¶ 6.

{¶ 18} Pursuant to R.C. 2745.01(A):

> In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

As defined by R.C. 2745.01(B), "substantially certain" means that an "employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death." Acting with the belief that an injury is "substantially certain" to occur is not analogous to

wanton misconduct, nor is it "enough to show that the employer was merely negligent, or even reckless." *Talik v. Fed. Marine Terminals, Inc.*, 117 Ohio St.3d 496, 2008-Ohio-937, ¶ 17; *Weimerskirch v. Coakley*, 10th Dist. Franklin No. 07AP-952, 2008-Ohio-1681, ¶ 8.

{¶ 19} Rather, as noted by the Ohio Supreme Court, one may recover "for employer intentional torts only when an employer acts with specific intent to cause an injury." *Kaminski v. Metal Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, ¶ 56; *Houdek v. ThyssenKrupp Materials N.A., Inc.*, 134 Ohio St.3d 491, 2012-Ohio-5685, ¶ 25 (finding "absent a deliberate intent to injure another, an employer is not liable for a claim alleging an employer intentional tort, and the injured employee's exclusive remedy is within the workers' compensation system").

{¶ 20} However, while generally requiring proof of an employer's specific intent to cause an injury, pursuant to R.C. 2745.01(C):

> Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result.

Simply stated, R.C. 2745.01(C) "establishes a rebuttable presumption that the employer intended to injure the worker if the employer deliberately removes a safety guard." *Rivers v. Elevator*, 8th Dist. Cuyahoga No. 99365, 2013-Ohio-3917, ¶ 25.

**"Equipment Safety Guard" and R.C. 2745.01(C)**

{¶ 21} As noted above, Downard argues the trial court erred by granting Rumpke a directed verdict at the end of her case-in-chief by finding the tire shredder's jib crane, observation platform, and interlock switch were not "equipment safety guards" as that term is used in R.C. 2745.01(C).

{¶ 22} As the plain language of the statute indicates, "[t]he General Assembly did not

make the presumption applicable upon the deliberate removal of any safety-related device, but only of an equipment safety guard[.]" *Fickle v. Conversion Technologies Internatl., Inc.*, 6th Dist. Williams No. WM-10-016, 2011-Ohio-2960, ¶ 42. As recently defined by the Ohio Supreme Court, the term "equipment safety guard" means "a protective device on an implement or apparatus to make it safe and to prevent injury or loss." *Hewitt v. L.E. Myers Co.*, 134 Ohio St.3d 199, 2012-Ohio-5317, ¶ 18. In turn, an "equipment safety guard" for purposes of R.C. 2745.01(C) is "a device designed to shield the operator from exposure to or injury by a dangerous aspect of the equipment." *Id.* at ¶ 26, quoting *Fickle* at ¶ 43; *see also Pixley v. Pro-Pak Industries, Inc.*, 6th Dist. Lucas No. L-12-1177, 2013-Ohio-1358, ¶ 21, *appeal allowed*, *Pixley v. Pro-Pak Industries, Inc.*, 136 Ohio St.3d 1472, 2013-Ohio-3790. In establishing this definition, the Ohio Supreme Court explicitly rejected a broader interpretation by stating that "to include any generic safety-related items ignores not only the meaning of the words used but also the General Assembly's intent to restrict liability for intentional torts." *Hewitt* at ¶ 24.

{¶ 23} Following the Ohio Supreme Court's recent decision in *Hewitt*, which found personal protective items such as rubber gloves and sleeves were not "equipment safety guards," the Ohio Supreme Court also found free standing equipment such as face masks were likewise not "equipment safety guards" under R.C. 2745.01(C). *Beyer v. Rieter Automotive North American, Inc.*, 134 Ohio St.3d 379, 2012-Ohio-5627, ¶ 1. This was in line with its previous decision in *Houdek*, which found "adequate lighting conditions and safety devices such as orange cones, reflective vests, and retractable gates" could also not be considered an "equipment safety guards." *Id.*, 2012-Ohio-5685 at ¶ 27. The Ohio Supreme Court has also remanded a different matter to determine whether a "back-up alarm" would constitute an "equipment safety guard." *See Beary v. Larry Murphy Dump Truck Service, Inc.*, 134 Ohio St.3d 359, 2012-Ohio-5626, ¶ 1.

{¶ 24} Several Ohio appellate courts have also had the opportunity to apply the newly minted "equipment safety guard" definition as provided in *Hewitt*. For example, in *Schiemann v. Foti Contracting, L.L.C.*, 8th Dist. Cuyahoga No. 98662, 2013-Ohio-269, the Eighth District Court of Appeals determined that a safety harness used by masons laying stone on an exterior wall was not an "equipment safety guard" as the safety harness was more akin to the rubber gloves and sleeves at issue in *Hewitt*. *Id.* at ¶ 23. The Eighth District also determined that decisions on when to shut down a public elevator do not fall within the limited definition of an "equipment safety guard." *Rivers*, 2013-Ohio-3917 at ¶ 25.

{¶ 25} In addition, the Third District Court of Appeals determined that a "lockout device" for an auger machine was not an "equipment safety guard" because it was an "item that the employee controls." *Conley v. Endres Processing Ohio, L.L.C.*, 3d Dist. Wyandot No. 16-12-11, 2013-Ohio-419, ¶ 14. However, in *Pixley*, the Sixth District Court of Appeals found a "safety bumper" on a transfer car used in a packaging facility was an "equipment safety guard" by finding it was "clearly designed to protect employees from a dangerous aspect of the equipment." *Id.*, 2013-Ohio-1358 at ¶ 22.

{¶ 26} These decisions, although informative, do not end the discussion of what constitutes an "equipment safety guard" under R.C. 2745.01(C). Prior to the Ohio Supreme Court's decision in *Hewitt*, most courts, including this one, used the definition of "equipment safety guard" as provided by the Sixth District in *Fickle*. This is significant considering the Ohio Supreme Court adopted the definition of "equipment safety guard" provided in *Fickle* when crafting a definition for "equipment safety guard" in *Hewitt*. *See Hewitt*, 2012-Ohio-5317 at ¶ 26. Therefore, *Fickle*, as well as those cases applying *Fickle*, are also significant in determining what constitutes an "equipment safety guard" under R.C. 2745.01(C).

{¶ 27} In *Fickle*, Tara Fickle was injured when her left hand and arm became caught in the pinch point of a roller while working at a coating machine at a Conversion Technologies

facility. *Id.*, 2011-Ohio-2960 at ¶ 2. Prior to her injury, the "jog control switch" and the "emergency stop cable" had been disconnected from the coating machine. *Id.* at ¶ 5-6. Fickle sued her employer alleging an employer intentional tort action under R.C. 2745.01. *Id.* at ¶ 7. The trial court, however, granted Conversion Technologies' motion for summary judgment after finding neither the jog control switch nor the emergency stop cable constituted an "emergency safety guard" pursuant to R.C. 2745.01(C). *Id.* at ¶ 11. Fickle subsequently appealed.

{¶ 28} On appeal, Fickle argued that both the jog control switch and the emergency stop cable were in fact "equipment safety guards" that had been "deliberately removed" from the coating machine prior to her injury. The Sixth District disagreed by finding:

> The jog control and emergency stop cable in this case were not designed to prevent an operator from encountering the pinch point on the rewind roller and, therefore, are not equipment safety guards for purposes of the presumption in R.C. 2745.01(C).

*Id.* at ¶ 44.

In so holding, the Sixth District explicitly stated:

> In reaching this conclusion, we recognize that those devices are designed or may operate to reduce the seriousness of injury to an operator whose hands or fingers are inadvertently drawn into the in-running rewind roller. We appreciate that these devices could very well mean the difference between a relatively minor and catastrophic injury. The scope of our review, however, does not permit us to inquire as to whether the General Assembly should have provided for a presumption of intent to injure where these types of safety devices or features are deliberately removed by the employer. We are not empowered to override or second-guess the public policy determinations of the General Assembly, but must follow the plain language of the statute.

*Id.*

{¶ 29} In applying the definition of "equipment safety guard" in *Fickle*, this court found the "tire bead" and "bead taper" on a two-piece, wheel-assembly unit were not "equipment

safety guards" under R.C. 2745.01(C). *Roberts*, 2011-Ohio-6223 at ¶ 24. In addition, the Eight District found safety equipment, such as safety jackets and face masks, were not "equipment safety guards." *Meadows v. Air Craft Wheels, L.L.C.*, 8th Dist. Cuyahoga No. 96782, 2012-Ohio-269, ¶ 10. The Ninth District Court of Appeals also found a "trench box" did not constitute an "equipment safety guard" because "[a] trench is not a piece of equipment and the trench box is not designed to protect the operator from any piece of equipment." *Barton*, 2011-Ohio-5704 at ¶ 11.

{¶ 30} The Sixth District returned to the question of what constitutes an "equipment safety guard" in *Zuniga*. In *Zuniga*, Celerina Zuniga sued her employer alleging an employer intentional tort action after she was injured while working at Norplas Industries' automobile bumper manufacturing plant. *Id.*, 2012-Ohio-3414 at ¶ 4. According to Zuniga, Norplas deliberately removed an equipment safety guard, a ventilation system, thereby giving rise to a presumption that it had deliberate intent to injure her. *Id.* at ¶ 7. In rejecting this claim, the Sixth District stated:

> While the ventilation system may have had the effect of shielding the conveyor nip point, appellant has presented no evidence that it was designed for that purpose. Neither was there any evidence presented that the ventilation system was adopted as a de facto shield for the nip point at any time. Absent such evidence, we must concur with the trial court that the ventilation system was not an 'equipment safety guard' within the meaning of the statute.

*Id.* at ¶ 24.

{¶ 31} The Sixth District's decision in *Zuniga*, therefore, highlights the fact that to constitute an "equipment safety guard" under R.C. 2745.01(C), the alleged safety guard must have been designed or adopted to shield the operator from exposure to or injury by a dangerous aspect of the equipment.

**Trial Court Erred in Finding the Interlock Switch was not an "Equipment Safety Guard"**

{¶ 32} Turning to the facts in this case, after a thorough review of the record, we find that neither the jib crane nor the observation platform, two of the alleged "equipment safety guards" at issue here, were designed or adopted to serve as a shield from the dangerous aspects of the tire shredder. Rather, these were merely part of a system of safety devices implemented on the tire shredder. As noted above, the plain language of the statute clearly indicates, "[t]he General Assembly did not make the presumption applicable upon the deliberate removal of any safety-related device, but only of an equipment safety guard[.]" *Fickle*, 2011-Ohio-2960 at ¶ 42.

{¶ 33} This court made a similar distinction in interpreting Ohio's former Employer Intentional Tort statute in *Anders v. Pease Co.*, 12th Dist. Butler No. CA89-11-156, 1990 WL 94240 (July 9, 1990). In *Anders*, a case that will be discussed more fully below, this court addressed the issue of whether the removal of an eight-to-twelve-inch section of "guide bar" on a uni-point radial saw constituted an "equipment safety guard." In questioning whether the trial court correctly found an "equipment safety guard" was deliberately removed, this court stated:

> We question the trial court's finding that Pease deliberately removed an equipment safety guard. The record shows that an eight to twelve inch section of a guide bar was removed to allow multi-directional cutting and to prevent a scissor guard from jamming. According to testimony, the purpose of this bar was to act as a measuring device and to brace the wood stock in order to achieve a straight quality cut. Ohio Adm.Code 4121:1-5.01(B)(69) defines "guard" as "the covering, fencing, railing, or enclosure which shields an object from accidental contact." **Since the purpose of the guide bar was not to prevent accidental contact with the blade, we question whether it can be considered an "equipment safety guard" under R.C. 4121.80(G)(1). Anders' expert, Dr. Ronald Huston, testified that in his opinion the bar was a "safety device." On cross-examination, however, he conceded that a particular feature**

> **could be a safety *device* without being a safety *guard*.**
> (Emphasis in italics sic, emphasis in bold added, and internal
> citation omitted.)

*Id.* 1990 WL 94240 at *2, fn. 2.

{¶ 34} The same rationale can be applied here. For example, the evidence presented in this case indicates the jib crane removed from the tire shredder was merely a tool used to remove jammed tires from the shredder's cutter box. There was no evidence that the jib crane was somehow designed to shield the employee from a dangerous aspect of the tire shredder; namely, the feeder gears or the cutting blades. In fact, an expert provided as part of Downard's case-in-chief, Dr. Bernard Ross, specifically testified the jib crane "could be" considered a "safety device." However, as noted above, an *equipment safety device* is not the same as an "equipment safety guard" under R.C. 2745.01(C). This is again confirmed by the Ohio Supreme Court's decision in *Hewitt* finding the term "equipment safety guard" does not include any and all "generic safety-related items." *Id.*, 2012-Ohio-5317 at ¶ 24.

{¶ 35} In addition, as it relates to the observation platform, the platform merely allowed for the operator of the tire shredder safe access to view the cutter box. According to Daryl Wallace, another expert who testified during Downard's case-in-chief, the observation platform protected employees through "guarding by distance." However, besides providing a place for the employee to stand and look into the cutter box, the platform in no way shielded the employee from making contact with the feeder gears or cutting knives. In turn, while potentially serving as another generic safety-related item, we find the observation platform at issue was not designed or adopted to serve as an "equipment safety guard" as that term is used in R.C. 2745.01(C). To hold otherwise would expand the definition of "equipment safety guard" as provided by the Ohio Supreme Court in *Hewitt*.

{¶ 36} However, as it relates to the interlock switch, the testimony provided as part of Downard's case-in-chief indicates the interlock switch was used to prevent the tire shredder

from operating once the hinged hood covering the feeder gears and cutting knives was removed.[1] Specifically, David Stuhlmiller, an engineering manager with Columbus McKinnon Corporation, the manufacturer of the tire shredder, testified the interlock switch is "placed underneath the [hinged hood] so that if the [hinged hood] is removed the switch is activated and it removes control power from the electrical system on the tire shredder," thereby stopping the machine.

{¶ 37} It is undisputed the trial court found the hinged hood to constitute an "equipment safety guard." Rumpke has not appealed from that decision. The hinged hood, while generally serving to allow for the smooth ingestion and flow of tires into the cutter box, also serves as a shield from the feeder gears and cutting knives. However, as David Stuhlmiller's testimony reveals, the hinged hood not only serves to shield access to the feeder gears and cutting knives, but it also engages the interlock switch allowing the tire shredder to operate. According to Daryl Wallace, the interlock switch was "designed to ensure that the guarding system, specifically the [hinged hood], was properly in place before running so that it would protect the employee from injury." The maintenance manual for the tire shredder also states the interlock switch disengages the machine when the "protective cover of the cutting box," i.e., the hinged hood, "is removed or out of position while the machine is in the normal operating mode."

{¶ 38} Furthermore, and most significantly, Dr. Bernard Ross testified to the importance of the interlock switch. As Dr. Ross testified:

> I think the most salient and damning modification is tying off the interlock. It's called a cam and roller limit switch. Tying that off, that is by bypassing it so that the machine could operate without the [hinged hood], whereas that switch is installed for the specific purpose of ensuring that the [hinged hood] is in place so that the machine can operate safely. So they defeated a very essential

---

1. The full name for the hinged hood as noted in the tire shredder's maintenance manual is the "hinged hood for operator safety and weather protection."

safety feature by tying off this interlock.

{¶ 39} When taken in its entirety, and when viewed in a light most favorable to Downard as the nonmoving party, this testimony firmly establishes the interlock switch as something more than a minor safety-related device. This is especially true when considering the interplay between the hinged hood, something which the trial court specifically found to be an "equipment safety guard," and the interlock switch. Simply stated, by rigging the tire shredder to bypass the interlock switch and removing the hinged hood, we find this constitutes the deliberate removal of an "equipment safety guard" under R.C. 2745.01(C).

{¶ 40} In so holding, we find it necessary to distinguish the facts in this case from those presented in *Fickle*. As noted above, the Sixth District in *Fickle* found the "jog control switch" and "emergency stop cable" did not constitute "equipment safety guards" under R.C. 2745.01(C) as they "were not designed to prevent an operator from encountering the pinch point on the rewind roller[.]" *Id.*, 2011-Ohio-2960 at ¶ 44. In this case, however, the evidence clearly indicates the interlock switch worked as part of and in conjunction with the hinged hood. Moreover, the uncontroverted testimony presented in Downard's case-in-chief establishes the interlock switch was installed for the direct and specific purpose to ensure the hinged hood was in place so that the tire shredder could operate in its intended manner. The interlock switch, therefore, is not merely another safety device as part of the tire shredder's overall safety system, but instead, an "equipment safety guard" as that term is used in R.C. 2745.01(C).

{¶ 41} Our finding is strengthened by Rumpke's own argument in support of its motion for directed verdict advanced before the trial court at the end of Downard's case-in-chief. As counsel for Rumpke stated:

> I want to address specifically the argument regarding the interlock and trying to treat it, essentially trying to treat it as additional – additional, quote, "guard." If the [hinged hood] is on

there, running, all right so the removal of the – in other words, if it is alleged that the hopper was removed, **it's the same thing. It won't run with the hopper there. They are trying to add on the tie-down of the [interlock switch] as almost an additional – an additional guard,** and what I want to go back to again, is if you go back and you try to redo this accident with everything in place as they said it would be, the [hinged hood] would be in place and the machine would be running. (Emphasis added.)

Continuing, Rumpke's counsel also stated:

If the [hinged hood] is in place, like they said we should have had it in place, the switch is closed, the machine is running. So it is – that interlock device, in our view, is not any – for the Court to consider as it relates to guards, is not, quote, an additional guard. **It is the [hinged hood] as one. The interlock and the [hinged hood] go together.** (Emphasis added.)

{¶ 42} Downard also argued that the interlock switch should be considered as a part of the hinged hood. As counsel for Downard stated after the trial court issued its decision finding the interlock switch did not constitute an "equipment safety guard:"

An integral part of the hood is the interlock which was only to be working with the hood on. And you take the hood off, it was manually tied back by the human conduct of a Rumpke employee per the testimony. **Now, I am having a very difficult time, Your Honor, with the Court's ruling that the interlock is somehow not tied to an in conjunction with, the hood.** Just as much as the lid is a part of the hinged hood for operator safety, and the sides of the hinged hood for operator safety are a part of that hood, that the interlock is, and I'm saying to the Court, **should be likewise consistent because it works in conjunction with, and it was specifically disabled.** (Emphasis added.)

{¶ 43} The trial court found the interlock switch was not an "equipment safety guard," but rather a device that was part of a "safety system." This decision is inconsistent with the evidence presented and the argument advanced by both parties. Simply stated, having found the hinged hood constitutes an "equipment safety guard," this would necessarily include a finding that the interlock switch also constitutes an "equipment safety guard" for purposes of R.C. 2745.01(C). Therefore, while we find no error in the trial court's decision

- 16 -

regarding the jib crane and observation platform, we find the trial court erred in its decision regarding the interlock switch.

**Rebutting the Intent to Injure Presumption Under R.C. 2745.01(C)**

{¶ 44} Having found the trial court erred in directing a verdict in favor of Rumpke at the end of Downard's case-in-chief regarding the interlock switch, we now turn to Downard's arguments regarding the rebuttable intent to injure presumption found in R.C. 2745.01(C). Specifically, Downard argues the trial court erred by finding Rumpke successfully rebutted the intent to injure presumption as it relates to the removal of the tire shredder's hinged hood. In support of this claim, Downard initially argues the trial court erred by requiring her to prove Rumpke removed the hinged hood with the intent to injure in order to first invoke the presumption. According to Downard, this was in direct contravention of *Fickle*, which stated, albeit in a footnote, the following:

> It is important to note that R.C. 2745.01(C) does not require proof that the employer removed an equipment safety guard with the intent to injure in order for the presumption to arise. The whole point of division (C) is to presume the injurious intent required under divisions (A) and (B). It would be quite anomalous to interpret R.C. 2745.01(C) as requiring proof that the employer acted with the intent to injure in order [to] create a presumption that the employer acted with the intent to injure. Such an interpretation would render division (C) a nullity.

*Id.*, 2011-Ohio-2960 at ¶ 32, fn. 2.

{¶ 45} This same issue was recently addressed by the United States Sixth Circuit Court of Appeals in *Rudisill v. Ford Motor Company*, 709 F.3d 595 (6th Cir.2013). In *Rudisill*, Norman Rudisill sued his employer alleging an intentional tort after he was injured while working at a Ford casting plant. *Id.* at 599-600. The district court, however, granted summary judgment to Ford finding it had successfully rebutted the presumption contained in R.C. 2745.01(C) by introducing evidence showing its lack of intent to injure. *Id.* at 600. Rudisill subsequently appealed.

{¶ 46} On appeal, Rudisill argued the district court erred by concluding Ford had successfully rebutted the intent to injure presumption as a matter of law. *Id.* According to Rudisill, the district court improperly determined that in order to invoke the presumption in the first instance, Rudisill "was required to present proof that the equipment safety guards were removed with the intent to injure," thereby undermining the very purpose of R.C. 2745.01(C). *Id.* at 608. The Sixth Circuit disagreed by finding the following:

> We are not persuaded by Rudisill's interpretation of the district court's ruling. A plaintiff is obviously not required to adduce evidence of an intent to injure in order to invoke the presumption of intent of injure; that is the point of a *presumption*. But once the presumption has been invoked, a defendant may rebut it by marshaling evidence that there was in fact no intent to injure; that is the point of a *rebuttable* presumption. (Emphasis sic.)

*Id.* Continuing, the Sixth Circuit stated:

> The district court's ruling that Ford had successfully rebutted the intent-to-injure presumption by adducing evidence of a lack of intent to injure does *not* mean that Rudisill was required to present evidence of an intent to injure in order to invoke the presumption in the first place. There is a significant difference between giving the defendant an opportunity to rebut a presumption and a finding that no presumption arose to begin with. Once the rebuttable presumption has been successfully invoked, the burden is on the *defendant* to rebut it by introducing evidence of the lack of an intent to injure; by contrast, in the absence of a presumption, the burden would be on *the plaintiff* in the first instance to introduce evidence of the intent to injure. (Emphasis sic.)

*Id.*

{¶ 47} In this case, just as in *Rudisill*, the trial court properly applied R.C. 2745.01(C). In fact, as the trial court specifically stated in ruling on Rumpke's motion for a directed verdict at the close of Downard's case-in-chief:

> They get a presumption, unless you say the presumption goes away, that's the whole point. They have a presumption and you have got a duty to rebut it. You cannot just stand pat and say that they didn't present evidence.

- 18 -

We find the trial court's decision regarding the application of R.C. 2745.01(C) in no way indicates the trial court improperly shifted the burden to Downard to first prove Rumpke removed an "equipment safety guard" with the intent to injure. Again, just as in *Rudisill*, the trial court's decision "does *not* mean that [Downard] was required to present evidence of an intent to injure in order to invoke the presumption in the first place." (Emphasis sic.) *Id.*, 709 F.3d at 608.

{¶ 48} Where a presumption is rebuttable, such as the case here, the production of evidence disputing or contrary to the presumption causes the presumption to disappear as if it had never arisen. *See Ayers v. Woodward*, 166 Ohio St. 138, 144 (1957) (stating "when either party introduces substantial credible evidence tending to prove a fact which would otherwise be presumed, the presumption either never arises or it disappears"); *In re Guardianship of Breece*, 173 Ohio St. 542 (1962) (holding "the production of evidence disputing or contrary to the presumption causes the presumption to disappear where such evidence to the contrary either counterbalances the presumption or even when it is only sufficient to leave the case in equipoise"); *see also* 1980 Staff Note, Evid.R. 301 ("once a presumption is met with sufficient countervailing evidence, it falls and the presumption serves no further function. If rebutted, the jury is not instructed that a presumption existed"). Therefore, we find Downard's claim the trial court improperly applied the intent to injure presumption as found in R.C. 2745.01(C) lacks merit as it is not supported by the record.

**The Intent to Injure Presumption May be Rebutted as a Matter of Law**

{¶ 49} The trial court's finding nevertheless raises the question of whether the intent to injure presumption can be rebutted as a matter of law or whether it is a question of fact for the jury to decide. The Sixth Circuit also addressed this issue in *Rudisill*, wherein the court determined whether the intent to injure presumption was rebutted as a matter of law must be determined on a case-by-case basis dependent upon the evidence properly before the court.

In reaching this decision, the Sixth Circuit in *Rudisill* explicitly disagreed with the Sixth District's decision in *Zuniga*.

{¶ 50} As noted above, in *Zuniga*, Celerina Zuniga sued her employer alleging an employer intentional tort action after she was injured while working at the Norplas International automobile bumper manufacturing plant. According to Zuniga, Norplas deliberately removed an alleged equipment safety guard, a ventilation system, thereby giving rise to a presumption that it had deliberate intent to injure her. *Id.*, 2012-Ohio-3414 at ¶ 7. The trial court, however, granted Norplas' motion for summary judgment. In so holding, the trial court determined that even if the intent to injure presumption had been established, "Norplas had presented sufficient evidence that the reason for the ventilator's removal was that it was ineffective as a dust collection device, thus defeating the statutory presumption," thereby rebutting the presumption as a matter of law. *Id.* at ¶ 8.

{¶ 51} The Sixth District disagreed with the trial court's ruling by finding, in pertinent part, the following:

> Once a statutory presumption of employer intent to injure is established, rebuttal of that presumption necessarily involves some weighing of evidence. This would preclude summary judgment on such an issue because weighing evidence or choosing among reasonable inferences is not permissible in a summary judgment analysis. (Internal citation omitted.)

*Id.* at ¶ 20.

{¶ 52} In addressing the same issue in *Rudisill*, the Sixth Circuit found the reasoning in *Zuniga* was merely dicta and otherwise unpersuasive. *Id.*, 709 F.3d at 606. Specifically, the Sixth Circuit found "[d]eciding whether the intent-to-injure presumption has been rebutted does not 'necessarily' require the weighing of evidence" as the Sixth District suggests. *Id.* Rather, according to the Sixth Circuit:

> Suppose, for example * * * the evidence is unequivocal and uncontroverted that the safety guard on a piece of equipment

was removed for repair, that the employee was not required to work with the equipment in such condition, and that there is no evidence that anybody intended any harm. There would be no evidence to weigh under these circumstances. All the evidence would point in one direction and the answer would be clear as a matter of law.

Of course, if the evidence adduced by a defendant to rebut the presumption is weak, or if a plaintiff presents substantial countervailing evidence, then resolution of the issue would require the weighing of evidence that would render summary judgment improper. But that is a big "if." * * * The dictum in *Zuniga* that deciding whether the presumption has been rebutted "necessarily involves some weighing of evidence," is therefore incorrect. Instead, deciding whether a jury question is presented depends on the circumstances of the particular case and the evidence before the court. (Internal citations omitted.)

*Id.* at 606-607.

{¶ 53} The Sixth Circuit's reasoning in *Rudisill* was based in part on the Fifth District's decision in *Shanklin v. McDonald's USA, LLC*, 5th Dist. Licking No. 2008 CA 00074, 2009-Ohio-251. In *Shanklin*, Demia Shanklin was injured while working as a food preparer at a McDonald's restaurant. The injury occurred as a result of Shanklin making contact with the corner of a microwave oven that contained an exposed inner wire that was connected to a magnetron. *Id.* at ¶ 7. At the time of her injury, the microwave oven was undergoing maintenance and the housing unit covering the microwave had been removed, thereby exposing a strong current of electricity throughout the unit. *Id.*

{¶ 54} Following her injury, Shanklin sued McDonald's alleging an employer intentional tort action. *Id.* at ¶ 9. In support of her claim, Shanklin argued the intent to injure presumption applied since McDonald's had deliberately removed the housing unit from the microwave oven. *Id.* The trial court, however, granted McDonald's motion for summary judgment finding McDonald's had rebutted the intent to injure presumption as a matter of law. *Id.* at ¶ 10. Shanklin then appealed.

{¶ 55} On appeal, Shanklin argued the trial court erred by granting McDonald's motion

for summary judgment. The Fifth District disagreed and stated:

> Assuming *arguendo* that the housing unit of the microwave oven can be considered an equipment safety guard, we find the evidence presented rebuts the presumption that the removal of the housing unit was committed with the intent to injure the employee.
>
> Robertson testified that the microwave oven was not functioning and in order to make the repair, he had to remove the housing unit covering the microwave. Once he made the repair, he activated the microwave oven to make sure it was operational. After the accident, Robertson reattached the housing unit and placed the microwave oven back into operation. During the repair of the microwave oven, [McDonald's] employees did not use the microwave oven for food preparation nor were they required to use the microwave oven for food preparation. Based upon such evidence, we find that Appellant's arguments fail as a matter of law under R.C. 2745.01(C). (Internal citations omitted.)

*Id.* at ¶ 41-42.

{¶ 56} The Sixth Circuit also relied on the Sixth District's earlier decision in *Dudley v. Powers & Sons, LLC*, 6th Dist. Williams No. WM-10-015, 2011-Ohio-1975, in finding the "intent to injure" presumption can be decided by the court as a matter of law. In *Dudley*, David Dudley was injured on his first day of work at Powers & Sons while operating a hydraulic press. *Id.* at ¶ 11. It was undisputed that Powers & Sons had made certain in-house modifications to the hydraulic press removing a dual actuating button that required the operator of the press to use both hands to activate the ram and replacing it with an optical sensor. *Id.* at ¶ 10. Dudley's left hand was crushed by the press when he reached into the press to clear loose material. *Id.* at ¶ 12.

{¶ 57} Dudley subsequently sued his employer alleging an employer intentional tort action. The trial court, however, granted summary judgment to Powers & Sons. According to the Sixth District, the trial court's reasoning for granting summary judgment to Powers & Sons was as follows:

> [T]he trial court granted Powers' motion for summary judgment,

ruling that the direct cause of the injury was not the removal of the dual buttons, but the installation of the electronic sensor. As such, the court determined that R.C. 2745.01(C) did not apply and that no statutory rebuttable presumption arose. The court reasoned that without this rebuttable presumption reasonable people could not disagree and Powers was entitled to judgment as a matter of law.

*Id.* at ¶ 15.

{¶ 58} On appeal, Dudley argued that the removal of the dual actuating button control was a direct cause of his injury entitling him the rebuttable presumption contained in R.C. 2745.01(C). In contrast, Powers & Sons argued the direct cause of the injury was not the removal of the dual actuating button, but the installation of a proximity switch, thereby removing it from the purview of the statute. *Id.* at ¶ 18. In reversing the trial court's decision, the Sixth District found "what the direct cause of the injury is constitutes a factual issue to be determined, not as a matter of law, but by a trier of fact." *Id.* at ¶ 19.

{¶ 59} Although already finding summary judgment was improper, the trial court then addressed the standard of review for rebuttable presumptions by stating the following:

> In an effort to rebut the presumption of intent, Powers has entered an affidavit from its manufacturing engineer that there was no intent by Powers to harm Dudley. The testimony of a Powers employee cannot be weighed so heavily to say that reasonable minds could not disagree on the issue of intent.

*Id.* at ¶ 21.

{¶ 60} According to the Sixth Circuit in *Rudisill*, the decision in *Dudley* stands for the proposition that:

> [W]here the only evidence presented by the defendant to rebut the intent-to-injure presumption under Ohio Revised Code § 2745.01(C) was an affidavit from its manufacturing engineer attesting that no harm had been intended, the issue of whether the presumption had been rebutted was for the jury to decide.

*Rudisill*, 709 F.3d at 605. The Sixth Circuit also determined the *Dudley* decision establishes that "self-congratulatory affidavits" standing alone would not be sufficient to rebut the intent

to injure presumption. *Id.* at 608. Based on these findings, the Sixth Circuit determined that "deciding whether a jury question is presented depends on the circumstances of the particular case and the evidence before the court." *Id.* at 607.

{¶ 61} Applying these principles, the Sixth Circuit in *Rudisill* determined Ford had provided sufficient evidence to overcome the intent to injure presumption. In so holding, the Sixth Circuit stated:

> Returning now to the key point that the presumption-rebuttal issue may in some cases be properly decided as a matter of law by the court, the question becomes whether that was the correct decision in the present case. We conclude that it was. As explained above, the district court took stock of the pertinent evidence – the lack of any prior substantially similar incidents despite the hundreds of millions of hours worked at the plant; the lack of any prior citations or complaints involving substantially similar conditions; the admission by Rudisill and other employees involved in the flask-removal process that they did not think the process was dangerous; the fact that Rudisill had routinely engaged in the process hundreds of times without incident; Rudisill's acknowledgment that he would have reported the condition if he had thought the process was dangerous and, as Team Leader, would not have let his coworkers engage in the process; and Rudisill's concession that he had no reason to think that his supervisor at Ford intended to harm him – and concluded that Ford had rebutted the presumption. We find no error in this conclusion.

*Id.* at 607-608. According to the Sixth Circuit, this was "hard, uncontroverted" evidence supporting the trial court's decision. *Id.* at 608.

{¶ 62} The Sixth Circuit's decision in *Rudisill* comports with case law from the Ohio Supreme Court. As previously stated, where a presumption is rebuttable, such as the case here, the production of evidence disputing or contrary to the presumption causes the presumption to disappear as if it had never arisen. *See Ayers*, 166 Ohio St. at 144. These principles are also contained in the 1980 Staff Note to Evid.R. 301, which again states, "once a presumption is met with sufficient countervailing evidence, it falls and the presumption serves no further function. If rebutted, the jury is not instructed that a presumption existed."

In other words, as recently stated by the Ninth District Court of Appeals in *Hoyle v. DTJ Ents., Inc.*, 9th Dist. Summit Nos. 26579 and 26587, 2013-Ohio-3223:

> A presumption shifts the evidentiary burden of producing evidence, i.e., the burden of going forward, to the party against whom the presumption is directed. However, a rebuttable presumption does not carry forward as evidence once the opposing party has rebutted the presumed fact. Thus, once the presumption is met with sufficient countervailing evidence, it fails and serves no further evidentiary purpose. The case then proceeds as if the presumption had never arisen. (Internal citations omitted.)

*Id.* at ¶ 18, quoting *Hall v. Kemper Ins. Cos.*, 4th Dist. Pickaway No. 02CA17, 2003-Ohio-5457, ¶ 92.

**{¶ 63}** The Sixth Circuit's decision in *Rudisill* also comports with the reasoning advanced by this court in addressing the intent to injure presumption contained under Ohio's former Employer Intentional Tort statute. Similar to the current statute, former R.C. 4121.80(G) provided:

> Deliberate removal by the employer of an equipment safety guard * * * is evidence, the presumption of which may be rebutted, of an act committed with the intent to injure another if injury or an occupational disease or condition occurs as a direct result.

**{¶ 64}** In *Anders*, a case which we briefly addressed above, Ronald Anders alleged an employer intentional tort action against Pease Company after he severed three fingers from his left hand while using a uni-point radial saw. *Id.*, 1990 WL 94240, at *1. After holding a bench trial, the trial court found in favor of Pease Company by concluding it did not act with deliberate intent to cause Anders' injury. *Id.* Anders subsequently appealed.

**{¶ 65}** On appeal, Anders argued the trial court's decision was against the manifest weight of the evidence because the record did not support the trial court's finding Pease Company overcame the rebuttable intent to injure presumption contained in R.C. 4121.80(G). *Id.* at * 2. This court disagreed by finding:

> The record *sub judice* is devoid of evidence of an intent to injure as contemplated by the statute. The only viable argument available to Anders rests upon the presumption created by the trial court's finding that Pease deliberately removed an equipment safety guard from the saw on which Anders was injured. The trial court further found, however, that Pease overcame the statutory presumption by demonstrating the absence of any intent on its part to injure Anders. Upon reviewing the record, we find no basis for disturbing this finding. Every witness who testified indicated that no one at Pease intended to harm Anders or any other worker. Anders himself testified that he knew of no one who would want him to be injured or harmed. In sum, we find that the evidence overwhelmingly supports the trial court's finding in favor of Pease. The facts of this case simply do not fall within the realm of an intentional tort as defined by R.C. 4121.80(G)(1). (Emphasis sic.)

*Id.*

{¶ 66} Anders also argued the trial court erred by denying his request for a jury trial.

However, this court again disagreed by finding:

> Had the case been tried to a jury, **a directed verdict in favor of Pease would have been warranted because there was no showing of an intent to injure Anders as required by R.C. 4121.80(G)(1).** Thus, any error in denying Anders a jury trial would be harmless. It would be a waste of judicial resources to remand a case such as this for a jury trial only to have it directed out before it ever reaches the jury. (Emphasis added.)

*Id.*

{¶ 67} Although dealing with Ohio's former Employer Intentional Tort statute, this court's decision in *Anders* demonstrates that the question of whether the intent to injure presumption was rebutted may be decided by the court as a matter of law. *See also Baker v. V.I.P. Contractors*, 12th Dist. Butler No. CA90-08-178, 1991 WL 81870 (May 13, 1991) (finding reasonable minds could differ as to whether the evidence presented was sufficient to warrant the rebuttal of the presumption found under the former employer intentional tort statute). However, as the case law reveals, this requires a showing through hard, uncontroverted evidence that the employer had no intent to harm the employee.

- 26 -

**Trial Court Erred by Finding Rumpke Rebutted the Intent to Injure Presumption as a Matter of Law**

{¶ 68} Having found the question of whether the rebuttable intent to injure presumption may be determined by the trial court as a matter of law, we must now determine whether the trial court erred in so holding here. In this case, the evidence submitted by Rumpke to rebut the intent to injure presumption came exclusively from Craig Stidham. As noted above, Stidham is a foreman at Rumpke's tire shredding facility, a position he has held since 2005. According to Stidham, the hinged hood and interlock switch were removed and disabled from the tire shredder in order to run a "piggyback" operation at the facility. A "piggyback" operation occurs when precut tire pieces are transferred from one tire shredder and into the tire shredder at issue here. As Stidham testified, this "made it a lot easier on the machine to cut because it was already precut once."

{¶ 69} However, the "piggyback" operation had its own limitations. For instance, although the tire shredder at issue was fed with precut tire pieces, those pieces could sometimes be upwards of six to eight feet long. Due to their length, the precut tire pieces would oftentimes get tangled with the feeder gears dislodging the hinged hood and trip the interlock switch causing the machine to shut down. In fact, according to Stidham's trial testimony, the precut tire pieces hit the original hinged hood with such force that it "physically broke it and pulled it into the machine and through the knives in nice little two-inch pieces."

{¶ 70} Instead of replacing the hinged hood, Stidham testified that Rumpke attempted to manufacture a replacement that would eliminate this problem. However, despite those efforts, the precut tire pieces would continue to wrap around the feeder gears, thereby requiring Rumpke to constantly shut down the machine. As Stidham testified:

> Still same problems, constantly these pieces getting wrapped around the gears, were constantly having to shut the machine off and go up there and reset this hinged hood into place because every time it would get hit, it would lift that limit switch. And it

would shut the machine down.

> So it was actually already shut down, but we would still lock it out, and you would have to go up there and unwrap that and get inside the cutter box and unwrap that piece off the feeder gear. Then you would have to go through the process of restarting the machine, both the diesel engine, which ran a generator, which was how it was powered, and you would have to literally set the amps and volts and what RPMs and how you were going to run it.

{¶ 71} Furthermore, when asked if there was any way to run the "piggyback" operation with the hinged hood in place, Stidham testified:

> No, we tried. We tried many times. But it just – we always ended up having to climb up there. It just never failed that something would get wrapped around the feeder gears. And ultimately as they are spinning this long piece of rubber, then hits this hinged hood, then lifts that limit switch and shuts everything down. And the point of aligning the machines up is to help increase your productivity, and it was very counterproductive.

Stidham later testified he had no intent to injure Johnson in any way through any modifications to the tire shredder. Besides Stidham's testimony, Rumpke did not provide any additional evidence to rebut the intent to injure presumption contained in R.C. 2745.01(C).

{¶ 72} In ruling on Rumpke's motion for directed verdict at the close of all evidence, the trial court stated:

> And so this Court is going to find and will rule that [Rumpke has] put on evidence to the effect that – have put on evidence from, I believe, Mr. Stidham himself that it was not his or fellow employees' intention to hurt Mr. Johnson or anyone else in the removal of the equipment, that there was a basis, there was a rationale, a reason other than a mere whim for the removal of the guard and the shielding. And that is so they could run this other shredder. This other shredder caused that guard and that shielding to become dislodged and to become trapped in the machine itself.

{¶ 73} As can be seen, the evidence presented by Rumpke to rebut the intent to injure presumption is not merely a vague denial that it did not intend to hurt Johnson. *See, e.g., Dudley*, 2011-Ohio-1975, ¶ 21 (merely submitting an affidavit from employers manufacturing

- 28 -

engineer that there was no intent to injure employee was insufficient to rebut the presumption of intent found in R.C. 2745.01(C)). However, contrary to the trial court's finding, the fact that Rumpke's actions had a specific functional purpose does not automatically exempt the process from intentional tort analysis. *See Rudisill*, 709 F.3d at 610. Rather, this serves as merely one factor that can be considered when determining whether the intent to injure presumption was in fact rebutted.

{¶ 74} This is especially true when considering the only evidence submitted to rebut the presumption came exclusively from Stidham's trial testimony. It is well-established "that the trier of fact is vested with the power to judge the credibility of witnesses and to determine the weight to be afforded to the evidence presented." *Coleman v. Hamilton*, 12th Dist. Butler Nos. CA2011-03-049 through CA2011-03-051, 2011-Ohio-4717, ¶ 14; *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81 (1984). In turn, the trier of fact is "free to accept or reject" any or all of the testimony of any witness, including testimony of an expert witness. *Weidner v. Blazic*, 98 Ohio App.3d 321, 335 (12th Dist.1994). This is true even where the evidence is undisputed for the trier of fact possesses the inherent right to reject any evidence properly presented. *Coleman* at ¶ 14, citing *Krauss v. Kilgore*, 12th Dist. Butler No. CA97-05-099, 1998 WL 422068 (July 27, 1998).

{¶ 75} By finding Rumpke had successfully rebutted the intent to injure presumption as a matter of law, the trial court stepped beyond its bounds and usurped the power vested with the jury, as the trier of fact, to judge the credibility and weight that should be afforded to Stidham's trial testimony. Unlike *Shanklin* and *Rudisill*, both of which found the intent to injure presumption was rebutted as a matter of law, this is a case where the only evidence submitted to rebut the intent to injure presumption came from Stidham's trial testimony, a foreman currently employed at Rumpke's tire shredding facility. This places the credibility and the weight to be given to Stidham's trial testimony at the forefront of this matter.

{¶ 76} Furthermore, the only evidence presented to rebut the intent to injure presumption indicates the hinged hood and interlock switch were removed or bypassed so that Rumpke could run the "piggyback" operation at the facility, thereby increasing output and productivity. This matter is therefore clearly distinguishable from a case like *Shanklin* where the evidence established the alleged equipment safety guard was removed for maintenance purposes. *Id.* at ¶ 41-42.

{¶ 77} This case is also distinguishable from a case like *Rudisill* where the "hard, uncontroverted" evidence indicated (i) there was a lack of any prior similar incidents despite hundreds of millions of hours worked at the plant; (ii) the lack of any prior citations or complaints regarding the process; (iii) the admission by the plaintiff and other employees that they did not think the process was dangerous; (iv) the fact that the plaintiff had routinely engaged in the process hundreds of times without incident; (v) the plaintiff's own acknowledgement that he would have reported the condition if he thought the process was dangerous; (vi) as well as the fact the plaintiff would not have let his co-workers engage in the process if he believed it was dangerous; (vii) and the fact that the plaintiff conceded he had no reason to think his supervisor had intended to harm him. *Id.*, 709 F.3d at 607-608.

{¶ 78} Again, the fact that Rumpke's actions had a specific functional purpose does not automatically exempt the process from intentional tort analysis. *See Id.* at 610. Therefore, whether Stidham's trial testimony alone was sufficient to rebut the intent to injure presumption was a question for the jury to decide and not by the trial court as a matter of law. Accordingly, we find the trial court erred in directing a verdict at the close of all evidence finding Rumpke had successfully rebutted the intent to injure presumption contained in R.C. 2745.01(C).

## Conclusion

{¶ 79} In light of the foregoing, we find no error in the trial court's decision directing a

verdict at the close of Downard's case-in-chief by finding the jib crane and platform were not "equipment safety guards" under R.C. 2745.01(C). However, we find the trial court did err in directing a verdict finding the interlock switch was not an "equipment safety guard." As noted above, the interlock switch was used in conjunction with the hinged hood, something the trial court specifically found to be an "equipment safety guard" as a matter of law. Accordingly, Downard's second assignment of error is sustained as it relates to the interlock switch only.

{¶ 80} Furthermore, we find no error in the trial court's application of the intent to injure presumption for it is clear the trial court did not improperly shift the burden to Downard as she now suggests. Nevertheless, we find the trial court's decision directing a verdict to Rumpke at the close of all evidence finding it had successfully rebutted the intent to injure presumption as a matter of law was in error. Based on the facts and circumstances of this case, whether the intent to injure presumption was successfully rebutted by Rumpke was wholly dependent upon the jury's determination of the credibility and weight to be given to Stidham's trial testimony. Accordingly, Downard's first assignment of error as it relates to whether Rumpke successfully rebutted the intent to injure presumption contained in R.C. 2745.01(C) is sustained.

{¶ 81} Judgment affirmed in part, reversed in part and remanded for further proceedings.

HENDRICKSON, P.J., and RINGLAND, J., concur.